*If this opinion indicates that it is "FOR PUBLICATION," it is subject to revision until final publication in the Michigan Appeals Reports.*

# STATE OF MICHIGAN

# COURT OF APPEALS

LISA GRIFFEY and CEDRIC GRIFFEY,

      Plaintiffs-Appellees,

v

DEPARTMENT OF CORRECTIONS,

      Defendant-Appellant.

UNPUBLISHED
July 21, 2022

No. 354322
Genesee Circuit Court
LC No. 17-108535-CD

Before: CAMERON, P.J., and O'BRIEN and SWARTZLE, JJ.

PER CURIAM.

After a month-long jury trial, a jury found in favor of plaintiffs, Lisa Griffey and Cedric Griffey, on their employment-discrimination and retaliation claims under the Civil Rights Act (CRA), MCL 37.2101 *et seq.*, against defendant, the Michigan Department of Corrections. The jury awarded plaintiffs $11,670,128.33. Defendant appeals that judgment as of right.

On appeal, defendant argues it is entitled to (1) reversal and dismissal of plaintiffs' claims, or a JNOV of no cause of action, because plaintiffs failed to prove a prima facie case of disparate treatment, hostile work environment, and retaliation under the CRA; (2) a new trial because of the trial court's erroneous decision to admit improper evidence and the behavior of plaintiffs' counsel during trial; or (3) remittitur or a new trial because the amount of damages was not supported by the evidence during trial or was otherwise improper. Finding no errors warranting appellate relief, we affirm.

## I. FACTUAL BACKGROUND

Lisa and Cedric both worked for defendant. This case was first filed because Lisa, a 55-year-old black woman, claimed in relevant part that she suffered a racially hostile work environment and disparate treatment while working for defendant. After the lawsuit was filed—which Cedric, as Lisa's husband, joined—plaintiffs claimed that defendant retaliated against Cedric, a 57-year-old black man, which led to plaintiffs amending their complaint to include a charge of retaliation against defendant.

-1-

## A. LISA'S CLAIMS

Plaintiffs met in January 1989. Plaintiffs were married in 1991. In October 2000, Lisa began working for defendant as a parole and probation agent. As part of her job, Lisa often wrote presentence investigation reports (PSIR), which required her to interview probationers and parolees.

For her first six years, Lisa worked in various offices in Wayne County. Then, in 2006, Lisa transferred to defendant's parole and probation branch in Macomb County. Lisa remained in defendant's Macomb office until 2014, at which time she moved to Davison, Michigan, with her family and requested a transfer to the Lapeer County office so she would work closer to where she now lived. In November 2014, Lisa's transfer was approved and she began working as an agent in Lapeer.

The Lapeer office was in the basement of the Lapeer County government building and courthouse. Defendant's parole and probation office was the only state-level department in the building, and it housed fewer than 10 employees. Lisa was the only employee who was black in the entire building. The parole and probation supervisor in Lapeer, Michael Slater, was the highest-ranking employee of defendant in the Lapeer County building. Supervisor Slater also supervised the Sanilac County parole and probation department. Supervisor Slater testified that Lisa was chosen to work in the Lapeer office by someone above him, which he thought was unusual. He clarified that Lisa was assigned to his office against his wishes. According to Supervisor Slater, Lisa agreed to cover some work in Sanilac County as a condition of transferring, which required her to drive out to the Sanilac County office. Lisa disagreed, testifying that she was unaware of the requirement to drive to Sanilac County as part of her job duties, which was about one hour from the Lapeer office. Lisa said that she was the only employee in the Lapeer office who was required to do so.

On Lisa's first day, Supervisor Slater took her around the building, along with another new hire, and introduced them to the staff. The other individual was a white male. During the introductions, Supervisor Slater told people that he did not know what he was getting with respect to Lisa, but he knew the white male would be a good agent. Lisa testified that she believed Supervisor Slater's comments were racially motivated, but she did not report them at the time.

According to Lisa, over the next two years, she was subjected to numerous racially inappropriate and offensive communications. At trial, Lisa provided some examples of racial harassment, but was clear that she was only discussing those she remembered.

Lisa testified that, one day during work, she was going over a map of Lapeer County with fellow Parole and Probation Agent Meegan Shephard. Agent Shephard directed Lisa's attention to Imlay City and said that it was where a majority of the black residents of Lapeer County lived. Lisa was surprised and offended by the comment, and testified that Agent Shephard "pretty much admitted that she didn't even know why she mentioned it." According to Lisa, in another instance involving Agent Shephard, Agent Shephard approached Lisa after lunch to tell her that someone in the building was asking about the new employees. Agent Shephard said she knew the person was asking about Lisa because the person described her as "the lady with different hairstyles[.]" Agent Shephard then said, "I don't know why [the person] didn't just call you the black one." Lisa

testified that Agent Shephard's comment made her feel singled out and harassed because of her race. Lisa told Agent Shephard that referring to her as "the black one" was offensive, and asked Agent Shephard not to do so in the future. Lisa also testified about a third instance involving Agent Shephard in which another agent, Parole and Probation Agent Tom Arend, was speaking with Agent Shephard in her office, which was across the hallway from Lisa's office. Agents Arend and Shephard were discussing one of Agent Shephard's parolees and the upcoming visit to the parolee's home. Agent Shephard told Agent Arend that the parolee was racist and did not like black people. Agent Shephard then told Agent Arend that they should send Lisa to do a home visit. Agent Shephard looked across the hall at Lisa, saw she overheard, and laughed. Lisa testified that she was offended and felt threatened by Agent Shephard's statements, though she was never actually asked to go on the home visit.[1]

Lisa also testified that, on a separate occasion, she was in the lunch room with Parole and Probation Agent Nicole Zolinski and the office receptionist, Martine Kraft. Agent Zolinski was discussing her family and told them that her stepsister, whose last name was "Kuhns," had adopted a child who was black. A homophonic comparison was referenced regarding the word "coon," which Lisa testified was a racial slur. According to Lisa, Agent Zolinski stated: "[Y]ou know, [Lisa], you should be able to sympathize with [the adopted child] or empathize with him. He's a young black kid and, you know, he's adopted by a family and their last name is Kuhn[s]. Isn't— you know, what do you think about that, [Lisa]?" Lisa said that she was offended and felt harassed by the implications of the story.[2]

Lisa also testified about interactions she had with Parole and Probation Agent James Olson, who was the most senior agent in the Lapeer office. When Supervisor Slater was out of the office, Agent Olson served as supervisor in his stead. One day, while Agent Olson was filling that role, Lisa asked him if she could speak with him in her office. Lisa wanted Agent Olson to review a document for her. Agent Olson stayed in the doorway, refused to enter, and said, "I'm not going to come into your office because you're scary."[3] According to Lisa, Agent Olson was a large man who would have no reason to be afraid of Lisa. She believed that Agent Olson's comment about her being "scary" was racially motivated.

On another occasion, according to Lisa, Agent Olson and Lisa were alone together in the office when he decided to show her a video on his work computer. Lisa described the video as follows:

---

[1] Agent Shepheard testified at trial and, for the most part, denied the pertinent allegations.

[2] Agent Zolinski testified that she told the story because it was common for the coworkers to discuss their lives outside of work. She said that she did not intend to offend anyone and was shocked that Lisa would think a discussion about Agent Zolinski's family was derogatory. Agent Zolinski denied telling Lisa that she should be able to sympathize with the child.

[3] Agent Olson testified that he could not recall any such interaction with Lisa.

It was Chris Rock talking about what black people should do not to get arrested. And immediately started in the video [sic], they are showing like police officers just beating up this black guy and Chris Rock is narrating the video pretty much giving black people advice on what they shouldn't do so that they are not arrested.

Lisa testified that Agent Olson told Lisa that he thought it was funny, and she told him that she did not think the video was funny and walked out of his office. She noted that Agent Olson did not show the video to the agents in the office who were white. As a result, she suspected that Agent Olson's decision to show her the racially insensitive video was because she was black.[4]

Lisa also described a second event involving a different racially inappropriate video she was shown at work. As pretext, Lisa testified that she and Parole and Probation Agent Brigette Avolio would often say "ain't nobody got time for that" when discussing how busy they were at work. After they had used the phrase for a period of time, Agent Avolio asked Lisa if she knew from where it originated. When Lisa said she did not know, Agent Avolio used her personal cell phone to show Lisa the video while they ate lunch together in the office lunchroom. Lisa described the video in the following manner:

So [Agent Avolio] got her personal cell phone and she pulled up the video of Sweet Brown on YouTube and it was video of a black female with a scarf on her head, with ashy lips and a gold tooth, and she was speaking incorrect English and she, you know, while—she was being interviewed by the news about a fire that happened in her neighborhood and it was the background of a bad neighborhood. And they were interviewing her and she—you know, during the interview she was saying ain't nobody got time for that and, at one point in the video, they even added music to it and she was saying it over and over.

Lisa said that Supervisor Slater was in the lunchroom when the Sweet Brown video was shown to her and heard it.[5] She testified that she told Agent Avolio that the video was not funny, and that she would never again use the phrase "ain't nobody got time for that" now that she was aware of its origin. According to Lisa, Agent Avolio used the phrase one more time after Lisa expressed her dislike of the video.[6]

---

[4] Agent Olsen acknowledged showing the video to Lisa and said that he regretted doing so because, in hindsight, he understood how it could be offensive. Though he also testified that he did not remember Lisa saying anything to him about the video being offensive when he showed it to her.

[5] Supervisor Slater acknowledged that he was in the room when Agent Avolio played the Sweet Brown video to Lisa, and he agreed that he heard the conversation between the two women leading up to the video being played. At the time of trial, Supervisor Slater could not specifically recall Lisa's reaction to the video.

[6] Agent Avolio acknowledged that she showed the Sweet Brown video to Lisa and said that she could see how the video was offensive, yet she denied that Lisa said she was offended by the video.

While Supervisor Slater only overheard the Sweet Brown video being played, Lisa testified that there were instances of racial harassment directly involving Supervisor Slater. Lisa recalled on one occasion where she, Supervisor Slater, and Kraft were discussing running. Lisa explained that she and Cedric enjoyed running in 5K races, to which Supervisor Slater and Kraft said that Africans were great runners because they had to run for food. They both laughed about the comment. Lisa testified that she thought it was "unprofessional" and in "poor taste."[7] According to Lisa, on another occasion, Lisa's coworkers decided to order pizza together as an office. Supervisor Slater came around to everyone's offices to ask what toppings they liked on their pizzas. When he entered Lisa's office, he asked if she wanted chitterlings on her pizza. Lisa testified that she was offended by the question because chitterlings were not pizza toppings, but were food items stereotypically eaten by black people. Lisa said that she told Supervisor Slater that she was offended by the comment, but he thought it was funny.[8]

Despite all of the above events, which occurred before August 2016, Lisa never made an official complaint of racial harassment to defendant. She did, however, speak with Cedric about it. Lisa testified that her mental health had begun to suffer from the constant comments to which she was being subjected. Cedric agreed that Lisa had been struggling to deal with the harassment at work. He also testified that it had affected their marriage and his mental health. Both plaintiffs, however, were concerned about reporting any racial harassment because they were aware of retaliation from defendant when individuals reported any type of discriminatory harassment.

This all changed, however, on August 3, 2016. When Lisa walked into work that day, she was greeted by Kraft, who said, "morning, mammy." Lisa testified that she had never heard Kraft refer to anyone else by that name, and being called "mammy" made Lisa "feel horrible." She explained that her understanding of the term was "what black women were called back in slavery who cared for the slave master's children." Cedric agreed that the term "mammy" was extremely offensive, and provided the following description of the term: "Mammy is a term that came up through the late 1800's and it talked about black females who nursed Caucasian children or slave master's children. They were usually depicted as a black female with monkey-like features and big lips and a scarf on their head." Cynthia Rogers, who was a field training officer for defendant and responsible for conducting training regarding harassment, testified that the term "mammy" involves "perceiving a black woman as overweight, unattractive, unintelligent, [and] subservient to a white person."

Upon hearing the comment from Kraft, Lisa walked to her office and decided that she had no option other than to file an official complaint. She sent an e-mail to Supervisor Slater, who was out of the office that day, explaining what had occurred. Lisa also sent an e-mail to Cedric describing Kraft's comment. When Supervisor Slater received the e-mail, he immediately contacted Kraft to ask her what happened. Kraft told Supervisor Slater that her use of the word "mammy" had been a slip of the tongue. Kraft told the same story at trial, which involved an

---

[7] Supervisor Slater denied making or hearing any comment about running for food and agreed that such a comment would be offensive.

[8] Supervisor Slater denied asking such a question, and said that the only time chitterlings were mentioned was when Lisa told him that she did not like chitterlings while Cedric did.

accidental combination of the words "ma'am" and "happy Wednesday." According to Kraft, she always greeted everyone by saying "happy Wednesday," or whatever day it happened to be. As to Lisa, though, Kraft explained they both started calling each other "ma'am" for reasons she could not recall. Thus, Kraft contended that when Lisa walked into the office on August 3, 2016, Kraft meant to say, "good morning, and happy Wednesday, ma'am," but garbled her words and said, "good morning, mammy." Kraft testified Lisa did not mishear the comment; to Lisa's ears, Kraft said the word "mammy."

Supervisor Slater instructed Kraft to go apologize to Lisa if it truly was an accident. Kraft did so, but could tell that Lisa was not receptive to the apology. Lisa testified that Kraft said she only was apologizing because Supervisor Slater had instructed her to do so. At trial, Lisa acknowledged that Kraft often called her "ma'am," but testified that she believed Kraft intentionally called her "mammy," which tracked Lisa's history of facing racial harassment in the office. Lisa did not think Kraft's explanation made sense.

After Supervisor Slater instructed Kraft to apologize, he called Lisa. Supervisor Slater expected the issue to have been resolved by Kraft's apology, but when he spoke with Lisa, she asked to speak with him in person when he was back in the office. When Supervisor Slater returned to the office on August 5, 2016, he met personally with Lisa in his office. Lisa was crying and discussed Kraft's "mammy" comment with him. Supervisor Slater believed that this comment was Lisa's only issue, but she informed him that there had been several instances of race-based comments at the office. According to Lisa, upon hearing this, Supervisor Slater appeared to become upset with Lisa, and she felt threatened by his visible anger, especially because he was one of the people who perpetrated the harassment.[9] Even so, Lisa gave an example to him. She was careful to avoid the instances where Supervisor Slater was himself involved in the racial harassment, so told him the example of the "Kuhns" family. Supervisor Slater told Lisa that she could file a complaint with a harassment counselor if she did not feel the situation had been resolved.

After meeting with Lisa, Supervisor Slater called each member of the staff into his office to discuss defendant's discriminatory harassment policies. Supervisor Slater said that Kraft likely understood the reason for the meeting, but all of the other staff members had no reason to believe his discussion of the policies was related to Lisa. Lisa, however, disagreed with that assumption, noting that she was the only employee in the building who was black. Lisa testified that she was upset with Supervisor Slater's decision to handle her complaint in that manner because she felt it alerted all of her coworkers that she had complained. Lisa believed that the tension in the office worsened after Supervisor Slater's actions.

By August 8, 2016, which was after the weekend, Lisa still had not contacted a harassment counselor to report the racial harassment. On that day, Supervisor Slater was instructed by his superiors that he was required, under defendant's policies, to report the racial harassment, so he contacted Harassment Counselor Kelly Miller and asked her to come to the office. On August 9, 2016, Harassment Counselor Miller came to the Lapeer County building and had Lisa fill out

---

[9] Supervisor Slater said that he was concerned, not angered, by Lisa's complaints.

several harassment-complaint forms documenting the harassment she had endured, limited to the preceding six months. When Lisa finished filling out all of her forms, she left the meeting room and went back to work. Later that day, Lisa saw Harassment Counselor Miller speaking jovially with Supervisor Slater and Agent Shephard, two people Lisa had just made complaints against. Upon seeing the interaction between those three, Lisa became confident that her complaints would not be handled appropriately.

According to Lisa, her fears of ostracism and worsening harassment were realized in the weeks after her complaint. She noticed that Agent Olson would glare at her when she came in the office. Lisa also noted that her main job in the Lapeer office was to write PSIRs, which sometimes required home visits, and before her complaints, her fellow agents would sometimes help her with home visits, but no one offered to help with home visits after her complaints. Additionally, on one occasion shortly after Lisa filed her complaints, she was left alone in the building while meeting with a probationer. Lisa testified that this was against the office's policies because the probationer might be dangerous. Lisa noted that she had never seen a white agent left alone with a probationer, and said that she believed it was inappropriate and slightly threatening.

At some point, Lisa requested a transfer out of the Lapeer office to work in Flint, Michigan. Defendant's Assistant Deputy Director James Blakely testified that he discussed the events described above with Lisa and Cedric, and found out about Lisa's transfer request. The assistant deputy director found Lisa's request and circumvented the normal procedures for transferring an agent to process Lisa's transfer to Flint as quickly as possible.

Lisa began working in defendant's Flint parole and probation office on September 26, 2016. Although Lisa requested the transfer, she did not believe that defendant was attempting to do her a favor by granting it. Cedric agreed, noting that Lisa did not suddenly feel better about the harassment after defendant chose to move her away from it. Instead, Lisa testified that defendant only acted when the assistant deputy director became involved and forced defendant to respond.

After she transferred, she was required to finish some of the PSIRs she had begun while working in Lapeer. Lisa testified that she did not know of any other occasion when an agent was required to take work with them after a transfer. Supervisor Slater said that this was relatively common because, otherwise, the Lapeer office would have been short-staffed related to the PSIRs that Lisa had already started.

According to Lisa, when she spoke to her coworkers in her new office, she found them immediately acting in a standoffish manner. She testified that she discovered Supervisor Slater had come to the Flint office and warned her coworkers she had filed discriminatory harassment complaints. Lisa said that this made her feel uncomfortable.

By October 15, 2016, Lisa had nearly a full caseload of parolees and probationers through the Flint office. One of her probationers was also on probation in a county other than Genesee, and therefore, had a separate probation agent in that county. The probationer in question told his other probation agent that he was feeling violent urges toward Lisa, though he did not mention her by name, and had considered killing her. The other probation agent contacted Lisa to warn her of the conversation, and Lisa reported it to her new supervisor, Parole and Probation Supervisor Tika Tyson. Lisa expected that the probationer would be determined to have violated the conditions of

his probation, and likely sent to jail. However, Supervisor Tyson decided to simply change the probationer's agent to another person in the Flint office and refer him for mental-health treatment. Lisa testified that this result scared her because it would still require the probationer at issue to go to the building in which she worked. Cedric was also worried about Lisa's safety.

Lisa's concerns were exacerbated because the Flint office did not have a dedicated and secured parking lot. As a result, Lisa had to park down the street from the Flint office and walk on public sidewalks to get in the building. Because she feared a possible attack from the probationer while walking into work, she had Cedric or their son drive her to the office, drop her off, and pick her up when her shift ended.

In December 2016, Lisa's stress from the racial harassment and fear of the probationer were peaking. She decided to speak with her primary care physician, Dr. Sudhir Walavalkar, about her issues. Dr. Walavalkar testified that he had been treating plaintiffs for about 25 years when Lisa came to see him in December 2016. Before that appointment, neither plaintiff had ever complained of problems with mental health, nor had they been prescribed medications for such issues. During the visit in December 2016, though, Dr. Walavalkar noted Lisa's emotional state was different. He said that she was suffering from anxiety and depression, which she reported being caused by her work environment. Lisa told Dr. Walavalkar that her work environment was racially hostile. Dr. Walavalkar testified that he had never seen Lisa so upset. As a result, he diagnosed her with anxiety, depression, and chronic stress. He also recommended that she see a psychiatrist to obtain additional treatment because "the amount of depression that she had was significant . . . ." On December 30, 2016, Dr. Walavalkar found Lisa to be totally disabled, unable to continue working for defendant, and ordered her to stop going to work.

In January 2017, Lisa was in the process of following through with Dr. Walavalkar's recommendations to seek mental health treatment. On January 23, 2017, she attended a psychiatric evaluation with Dr. Gerald Shiener, who was qualified as an expert in "psychiatry, neurology, forensic psychiatry, addiction psychiatry, geriatric psychiatry, and psychosomatic psychiatry." Dr. Shiener identified some of Lisa's issues as feeling anxious and stressed all of the time, having nightmares about work, and being depressed. He noted that Lisa's most significant issue, though, was the depression. Dr. Shiener diagnosed Lisa with major depression with features of post-traumatic stress disorder (PTSD). Dr. Shiener explained the diagnosis of major depression in the following manner:

> Major depression is a mood disorder and major depression is an illness of guilt, self[-]blame, we have a sense of failure, you feel as if you should have been able to do better and didn't or couldn't, and you suffer with feelings of guilt, remorse, self-doubt, and you have an impairment in sleep, impairments in appetite, impairments in energy level, impairments in concentration.

On January 31, 2017, Lisa attended an initial intake appointment with a therapist, Wendell Harris. Harris opined that Lisa had "a combination of anxiety, you know, with the panic attacks, anxiety attacks, and she's also depressed." Harris testified that Lisa's issues arose from work-related stress, and he diagnosed her with an adjustment disorder with mixed anxiety and depression. Lisa's symptoms included difficulty sleeping, lack of energy, social withdrawal, apathy, and difficulty being assertive.

On February 3, 2017, plaintiffs filed the original complaint in this lawsuit. With respect to Lisa, plaintiffs alleged that defendant violated the CRA by treating her differently than her white coworkers, subjecting her to a racially hostile work environment, and retaliating against her after she complained of the racial harassment. As for Cedric, plaintiffs claimed only a loss of consortium.

After filing the complaint, Lisa continued to seek treatment while on leave from work. On February 14, 2017, she began seeing a psychiatrist, Dr. Leon Rubenfaer. After conducting an evaluation, Dr. Rubenfaer diagnosed Lisa with an "adjustment disorder which is a psychiatric condition that is caused by stress and severe distress in—in a situational environment; meaning that it's an emotional disorder brought on by outside sources, not in—not internal sources, and it usually is composed of a depressed and anxious mood." Dr. Rubenfaer opined that Lisa's adjustment disorder had been caused by the harassing and racially hostile work environment she had suffered. Dr. Rubenfaer explained that the events at work "made her to feel less of a person, lowered her self-esteem, caused her to feel as though she was made to feel made a fool of and— and not treated properly at all." Dr. Rubenfaer reported that Lisa experienced anxiety, depression, sadness, lack of sleep, nightmares, flashbacks, poor self-esteem, and racing thoughts. At the time, Dr. Rubenfaer recommended that Lisa continue to see a therapist and prescribed her Celexa, an antidepressant. Dr. Rubenfaer also extended Lisa's leave from work because he did not believe her return date of March 6, 2017, was appropriate.

Dr. Rubenfaer saw Lisa again on March 14, 2017, and April 11, 2017. Her problems continued and became chronic, Dr. Rubenfaer testified. These continuing issues led to Lisa becoming "distrustful, suspicious, and very disturbed . . . ." Lisa's quality of life had been harmed, she felt that she could not enjoy things she used to enjoy, and she felt distressed all of the time. When speaking with Dr. Rubenfaer on April 11, 2017, Lisa told him that she wanted to transfer back to defendant's Macomb office when she was required to return to work. Lisa believed that the situation would be better there because she still knew other agents who worked in Macomb.

In May 2017, when Lisa was about to return to work, her transfer to the Macomb office was approved by defendant. Despite desiring the transfer to escape what she believed to be a dangerous situation in Flint, Lisa did not enjoy having to drive over one hour to and from work each day, considering she still lived in Davison. At about this time, Lisa was taking medications for anxiety and depression.

That same month, she saw Dr. Rubenfaer for her fourth and final visit. Dr. Rubenfaer noted that Lisa's mood had slightly stabilized, which supported her return to work. However, this did not mean she was cured. Instead, Dr. Rubenfaer testified that Lisa's prognosis was poor, and he believed that she would require lifelong medication and psychotherapy to ensure her condition did not worsen. While he guardedly hoped she might improve, Dr. Rubenfaer was more concerned about her condition worsening and potentially resulting in suicide. In his opinion, Lisa had not substantively benefited from treatment, she likely never would, and she was totally and permanently disabled. In other words, Dr. Rubenfaer opined that Lisa could not and should not return to work on a permanent basis. Also during May 2017, Lisa saw Harris, her therapist, for the last time before a long hiatus. Harris agreed with Dr. Rubenfaer that Lisa's issues had become chronic. He noted that her anxiety continued throughout treatment and she was unlikely to improve at all until she no longer had to work, if ever.

According to Lisa, she had difficulty trying to reinitiate herself with the staff of defendant's Macomb parole and probation office because, despite defendant's promise of confidentiality, Lisa believed that her coworkers at the Macomb office had been told about her complaints of racial harassment in Lapeer. For instance, Lisa testified about a problem she had with one of her former coworkers, Parole and Probation Agent Heidi Zarka, who still worked at the Macomb office. On one occasion, Agent Zarka appeared to become upset with Lisa when she refused Agent Zarka's offer of help with a difficult probationer. According to Lisa, a few weeks later, she and Agent Zarka were alone in the copy room together when Agent Zarka walked up behind Lisa's back and whispered in her ear, "mammy, mammy, mammy," before walking out. Lisa was upset and immediately reported the event to her supervisor, who submitted the case to a harassment counselor for investigation. Lisa believed that Agent Zarka had been told what word to use to trigger a response form Lisa. Agent Zarka denied saying the words, but Lisa's supervisor agreed to move her office so they would not sit so close together.

Eventually, at some point in September or October 2018, Lisa attended a mandatory training at defendant's Macomb office. The training was conducted by Field Training Officer Rogers, who said that the topics and presentations were prepared by defendant at its headquarters. While the training generally was outlined for her, she was responsible for the specifics of each session. Field Training Officer Rogers stated that she planned to run one training per week at the Macomb office, with different employees attending the training each day.

On the day at issue, the topic of the training was harassment in the workplace. Lisa attended the training on Tuesday, and during the lunch break, was approached by Field Training Officer Rogers and her co-trainer, Anchelle Anderson, about the upcoming session. Lisa was told that the next segment of the class would be about racial harassment, and asked if she was comfortable with it. Lisa said it was fine, as long as there was no focus on her issues or case. Field Training Officer Rogers agreed that would not happen, though she testified that only Anderson knew of Lisa's specific complaints.[10] However, when the training session was underway, Field Training Officer Rogers announced to the class she would be discussing examples of racial harassment, and asked the class what could be considered racially offensive about the Gone with the Wind movie, to which someone in the class said the term "mammy" is used for a black character in the movie. Field Training Officer Rogers agreed that the term was offensive and provided a description of its meaning. She also displayed an image of a black woman with exaggerated and monkey-like features as an example of offensive material.

Lisa reacted poorly to the example, walked out of the training, and broke down crying. She was unable to continue work that day, felt unable to drive home, and had Cedric pick her up. Field Training Officer Rogers testified that the example was not directed at Lisa because Field Training Officer Rogers did not know any of the specifics of Lisa's case. Lisa did not believe the reference

---

[10] Field Training Officer Rogers testified that she was not aware of Lisa's experiences being called "mammy" in the Lapeer and Macomb offices, so Lisa was not warned about those specific upcoming examples. Field Training Officer Rogers insisted that she would have changed the examples she had planned to use if she had been informed by anyone of Lisa's particular circumstances.

to Gone with the Wind was coincidental, testifying that she had heard the term "mammy" far too many times for her to believe it was accidental.

Toward the end of 2018, Lisa went out on a second medical leave. Although Lisa thought she needed more time on leave, she was forced to return to work after defendant sent her to see a state psychiatrist, who determined she could return to work, so she did.

In April 2019, Dr. Shiener, who had initially performed a psychiatric evaluation of Lisa in January 2017, reevaluated Lisa to see how her mental health had progressed over the preceding two years. He opined that the transfer to Macomb had helped her condition, but it had not been cured. Dr. Shiener noted that the training incident, which had included a discussion of Gone with the Wind and a reprisal of the use of the word "mammy" was an unfortunate recurrence of a trauma. This affirmed Lisa's sense of hopelessness and her feelings that she could do nothing to escape the harassment at work. He further opined that Lisa's condition had become chronic and would require lifelong therapy and medication, though he noted that she had discontinued taking her antidepressant. He continued to diagnose Lisa with depression with a history of trauma reactions, and opined that Lisa's mental health required her to leave her employment with defendant.

At trial, Lisa testified about how defendant's harassment and retaliation had affected her. She said that she felt betrayed by defendant after many years of service. She described defendant's responses to her harassment as unfair and absurd. Lisa said that she had been changed as a person. As of trial, she still had difficulty sleeping, suffered from depression, and barely left her home. Indeed, Lisa claimed that she rarely did anything other than go to work and church. As the process continued, Lisa's mental suffering increased. She had not been provided the opportunity or a reason to heal, noting defendant's utter failure to take responsibility for her suffering. According to Lisa, one of the worst consequences for her was her reputation among her coworkers, which had changed to that of a liar. Lisa testified that she regretted filing the complaint because she never wanted to be in this situation.

## B. CEDRIC'S CLAIMS

Cedric began his career with defendant as a corrections officer (CO) in August 1989, shortly after he met Lisa. Over the years, Cedric was promoted to sergeant, then lieutenant, then acting inspector, then captain, and finally, on March 1, 2014, Cedric was named the deputy warden of Thumb Correctional Facility (TCF), in Lapeer, Michigan. Cedric only ever received positive reviews from his supervisors and, until the events of this case, never received any disciplinary action from defendant. According to Cedric, throughout his career, he had faced some racially harassing language—for instance, Cedric described an occasion where coworkers hung up photographs of Cedric describing him as a "Bubba"—but he never made any official racial harassment complaints with defendant because he believed the proper method for solving issues was to speak to people one-on-one.

Lisa told Cedric about the harassment she was facing after her transfer to Lapeer County, but like Lisa, Cedric was hesitant to make any reports. Cedric testified that he was upset because he saw how the harassment was affecting Lisa, but he knew that defendant retaliated against employees who complained. Thus, he believed it was best to stay silent and hope the harassment would stop once Lisa's coworkers got to know her better.

As detailed above, however, things only got worse for Lisa, even after she made her formal complaint in August 2016, and the continually-mounting stress led her to see Dr. Walavalkar in December 2016. Lisa's situation was weighing heavily on Cedric, so he decided to also be evaluated by Dr. Walavalkar at that time. Dr. Walavalkar testified that, during the evaluation, Cedric became "extremely anxious, upset, and also [had] a very high heart rate and gets tachycardic." Dr. Walavalkar continued, stating that Cedric "was emotionally extremely upset, he was also very anxious and distraught because of the situation at work." Dr. Walavalkar diagnosed Cedric with anxiety, for which he prescribed Xanax, and a work-related major depressive disorder. Dr. Walavalkar also encouraged Cedric to see a psychiatrist for his mental-health issues. As related to Cedric's physical health, Dr. Walavalkar noted that the depression and anxiety could lead to high blood pressure and an exacerbation of Cedric's previous issues with cholesterol.

On December 21, 2016, after Lisa had just taken her first medical leave, Prisoner Demorest,[11] who was housed at TCF and had a history of self-injurious behavior, was acting oddly while Cedric was not at work. Denise Lavender Jones, the prison's psychologist, assessed Prisoner Demorest and created a management plan. Although defendant's policies required a self-injurious prisoner to be stripped of their clothing and confined in a protective jacket, a sergeant on duty urged Jones to write a plan allowing Prisoner Demorest to remain clothed. Upon this urging, Jones relented, wrote the plan as requested, and the sergeant provided it to Lieutenant Richard Miller, who signed it. Lieutenant Miller reviewed the plan with Lieutenant Brent Whitman, who did not object to it.

The next day, December 22, 2016, Prisoner Demorest had to be stopped from injuring himself by other officers. Deputy Warden Scott Schooley, a colleague of Cedric, was made aware of the issue. Deputy Warden Schooley contacted Cedric, who technically supervised Lieutenants Miller and Whitman, and asked if Cedric would allow Deputy Warden Schooley to address the issue. Cedric agreed, and later that day, Cedric, Lieutenant Whitman, Lieutenant Miller, and Deputy Warden Schooley met in Deputy Warden Schooley's office. According to Lieutenant Whitman, Deputy Warden Schooley yelled and cursed at the two lieutenants for failing to follow policies. After being verbally disciplined by Deputy Warden Schooley, Lieutenant Whitman believed the issue had been resolved. Cedric encouraged Lieutenants Whitman and Miller to take the conversation to heart, to reread the policies, and to ensure they were followed.

Deputy Warden Schooley, however, decided to submit the case for an investigation of possible work-rule and policy violations. In response to Deputy Warden Schooley's filing, Internal Affairs (IA) Manager Stephen Marschke assigned the investigation to Kevin Smith, who was the inspector on staff at TCF, with supervision by IA. Inspector Smith began his investigation shortly thereafter, sending notices of investigation to Lieutenants Miller and Whitman, as well as the sergeant involved. Inspector Smith also sent a questionnaire to Cedric, considering he was present in the room when Deputy Warden Schooley yelled and cursed at Lieutenants Miller and Whitman. Cedric agreed that the event occurred, but did not believe it was a problem. Inspector Smith, however, believed that Deputy Warden Schooley's decision to yell and curse at two subordinates was a violation of certain work rules. Inspector Smith also was concerned about Deputy Warden

---

[11] Prisoner Demorest's first name was not provided in the lower court record.

Schooley's denial of swearing at his subordinates. Inspector Smith suspected Acting-Warden George Stephenson had been aware of Deputy Warden Schooley's improper behavior and had failed to report it.

Because the investigation had shifted to focus on Deputy Warden Schooley and Acting-Warden Stephenson, Inspector Smith contacted IA to report his progress. At the time, which was at the end of January 2017, IA Manager Marschke was out of the office. As a result, Inspector Smith spoke with Kathy Warner, the administrator of defendant's Office of Executive Affairs, who handled some of IA Manager Marschke's responsibilities when he was not in the office. According to IA Manager Marschke and Administrator Warner, defendant's policies required the investigation to be turned over to IA because it involved Inspector Smith's superiors.

While this investigation was progressing, Lisa—as explained above—attended a psychiatric evaluation with Dr. Shiener in January 2017. Because Cedric was feeling stressed and anxious about Lisa's treatment at work, he also underwent a psychiatric evaluation by Dr. Shiener. Dr. Shiener testified that Cedric was having trouble sleeping, experiencing ruminative thoughts, losing weight, and dealing with a reduction in sex drive, and concluded that he, like Lisa, had "become psychiatrically ill." Dr. Shiener noted that Cedric's issues at the time primarily were related to Lisa, explaining that he felt helpless while observing Lisa struggle at work, which hurt him. Dr. Shiener reported that Cedric already was exhibiting manifestations of an inability to properly love and work. Specifically, Dr. Shiener testified that Cedric "had significant behavioral representations of anxiety consistent with his complaints, and I diagnosed an adjustment disorder with mixed emotional features that had become chronic."

Then, on January 31, 2017, Cedric went with Lisa for the initial intake appointment with therapist Harris. Harris noted that Cedric primarily was having stress and anxiety related to the harassment Lisa was facing at work. He felt angry his wife was being treated poorly, especially because his hands were tied with respect to helping her.

One day later, on February 1, 2017, Administrator Warner informed Inspector Smith that he was being removed from the investigation into the events involving Prisoner Demorest and Deputy Warden Schooley's yelling at Lieutenants Miller and Whitman. In his place, Administrator Warner assigned the investigation to IA Investigator Nicholas Cusack.

When Deputy Warden Schooley became aware that IA Investigator Cusack had been assigned to the ongoing investigation at TCF, he contacted IA Investigator Cusack to ask if he should be recused from the investigation considering they were friends. IA Investigator Cusack spoke with Administrator Warner about the issue, and she approved his continued work on the investigation. According to IA Investigator Cusack, he told Administrator Warner that he was not friends with Deputy Warden Schooley, and that the two had only worked together previously. Administrator Warner agreed with IA Investigator Cusack's testimony, noting that people investigating one another often know each other because of intradepartmental job changes. IA Investigator Cusack sent a text message to Deputy Warden Schooley informing him that he would not be recusing himself from the investigation.

With IA Investigator Cusack now running the investigation into the Prisoner Demorest and Deputy Warden Schooley issues, he reviewed the questionnaires that had been completed by

Lieutenant Whitman, Cedric, and Lieutenant Miller. IA Investigator Cusack testified that he did not receive any notes from Inspector Smith about the progress of the investigation to that point, nor did he call Inspector Smith to ask him about it. IA Investigator Cusack did, however, notice that the answers to question number eight for Lieutenants Miller and Whitman, which was about what occurred in Deputy Warden Schooley's office, were nearly identical, including the same punctuation errors. IA Investigator Cusack became suspicious Lieutenants Miller and Whitman shared their answers to the questionnaire, which was a violation of policy. Upon further review of Cedric's responses, IA Investigator Cusack believed that Cedric's answer to question number eight was substantially similar to those of Lieutenants Miller and Whitman, although not identical.

As a result of his suspicions, IA Investigator Cusack contacted Administrator Warner and asked for approval to search the e-mail accounts of Lieutenant Miller, Cedric, and Lieutenant Whitman. Despite some initial hesitance, Administrator Warner approved IA Investigator Cusack's request. When he did so, IA Investigator Cusack discovered that Lieutenant Miller had sent an e-mail with a copy of his answers to Lieutenant Whitman after they received their questionnaires from Inspector Smith. A few days later, after Cedric received his notice of investigation from Inspector Smith, Lieutenant Miller sent an e-mail to Cedric with Lieutenant Miller's completed questionnaire attached. The body of the message directed Cedric's attention to number eight of the attached questionnaire. While IA Investigator Cusack's review of the records showed that the e-mail had been opened and deleted by Cedric, there was no data on whether the attached questionnaire had been opened and reviewed. Even so, IA Investigator Cusack believed that the body of the message, which directed Cedric's attention to question eight, proved Cedric requested the e-mail be sent to him.

With the foregoing evidence in hand, IA Investigator Cusack began shifting the focus of the investigation. He suspected Lieutenant Miller, Cedric, and Lieutenant Whitman of colluding in their responses to frame Deputy Warden Schooley, and prepared new questionnaires, this time including questions about whether answers to previous questionnaires were shared. Lieutenant Miller, Cedric, and Lieutenant Whitman all denied sharing answers to questionnaires during Inspector Smith's investigation. Similarly, Deputy Warden Schooley denied cursing at Lieutenants Miller and Whitman. IA Investigator Cusack also asked Deputy Warden Schooley's secretary if she heard yelling coming from the office, which she denied.

On April 19, 2017, IA Investigator Cusack came to TCF to conduct in-person interviews with those involved in the investigation. When he arrived at the facility, Deputy Warden Schooley came outside of the building, greeted IA Investigator Cusack in the parking lot, and the two walked in together. IA Investigator Cusack could not recall what topics they discussed during the walk inside, but insisted it was not the investigation. During the in-person interviews, Lieutenant Miller, Cedric, and Lieutenant Whitman repeated their denials of sharing answers to their questionnaires. Likewise, Deputy Warden Schooley and his secretary denied that Deputy Warden Schooley yelled and cursed at Lieutenants Miller and Whitman. When IA Investigator Cusack left TCF for the day, he was escorted to his vehicle by Deputy Warden Schooley.

On June 1, 2017, Acting-Warden Stephenson was replaced with Warden Willis Chapman. When Warden Chapman started, he was directed to plaintiffs' original complaint, which was still in the desk previously used by Acting-Warden Stephenson. About two months later, on August 26, 2017, events leading to a second investigation of Cedric commenced. On that day, Prisoner

Harding-Bey, whose first name was not provided on the record, had a visit with his girlfriend, Saundra Cheeks. Cheeks was a former employee of defendant who, before being fired, had worked with Cedric at a different prison many years previously. Cedric was not at work when Cheeks visited Harding-Bey, and her visit was being monitored by CO Thomas Goodfellow. While supervising the visit, CO Goodfellow saw what he believed was Prisoner Harding-Bey pulling Cheeks' blouse to look at her breasts, which was a violation of the rules against sexual contact in the meeting room. CO Goodfellow showed the video to his shift commander, Lieutenant Patrick Moore, Jr., who agreed that Prisoner Harding-Bey and Cheeks had violated the rules. Consequently, Lieutenant Moore ended the visit, CO Goodfellow wrote a misconduct ticket for Prisoner Harding-Bey, and issued a visitor restriction for Cheeks.

Relevantly, the process for misconduct tickets is relatively confusing and requires some explanation to fully understand the events in this case. A ticket must be reviewed with a prisoner within 24 hours of being written, or it will be thrown out. When a CO writes a ticket, they submit it in a box specifically designated to collect such tickets. At some point later, a shift commander will look at the tickets to see if they are well-written and supported by video evidence. According to all of the witnesses who worked at TCF, this step was relatively important because TCF had a history of a poor conviction rate with respect to misconduct tickets. Therefore, TCF management, especially Cedric, stressed to shift commanders that they should not review with prisoners poorly written or uncorroborated tickets. In short, if the TCF staff stopped bad tickets from going forward by refusing to review them, the conviction rate would increase, which was an important statistic used by defendant to track prison performance. If a shift commander decided not to review the ticket with a prisoner, TCF policy required the shift commander to discuss the decision with the CO who wrote the ticket. If, on the other hand, the shift commander believed the ticket was good, they would review it with the prisoner. After the ticket is reviewed, only a warden was permitted to stop the misconduct ticket from going forward. Assuming no intervention from the warden, the ticket would then go to a hearing officer, who would determine whether the prisoner was guilty of the alleged misconduct.

As relevant to the present case, CO Goodfellow submitted the misconduct ticket regarding Prisoner Harding-Bey shortly after the event occurred. At 7:24 a.m. on the next morning—August 27, 2017—Cheeks sent a text message to Cedric on his work phone, informing him of the visitor restriction and asking for his help. Cedric testified that when he arrived at TCF shortly after 8:00 a.m., he had yet to see the text message from Cheeks. As he was walking toward his office, he was stopped by Inspector Adam Douglas, who was in the office of Hearing Investigator Rodney Buhl. Hearing Investigator Buhl's job was to gather and review evidence related to misconduct tickets to prepare for the hearing with the hearing officer. On this day, before Cedric arrived, Hearing Investigator Buhl had been alerted of the visitor restriction for Cheeks and the misconduct ticket for Prisoner Harding-Bey. Hearing Investigator Buhl and Inspector Douglas decided to review the surveillance video of the visit to determine whether the misconduct ticket and visitor restriction were appropriate. After watching the footage, they both opined that the contact between Prisoner Harding-Bey and Cheeks did not amount to a violation of the policy related to sexual contact.

When they saw Cedric walking into the office, Inspector Douglas decided to get a third opinion from the deputy warden. Cedric, who was the highest-ranking official in the room, watched the video and agreed with Inspector Douglas and Hearing Investigator Buhl. Thus, they

determined that the visitor restriction would be revoked and the ticket should not be reviewed with Prisoner Harding-Bey.

Because the ticket had not been removed from the specified box yet, Cedric sent an e-mail to CO Goodfellow's supervisor, Captain McDonald, whose first name was not provided on the record. Cedric informed Captain McDonald that the ticket would not be reviewed and instructed him to tell CO Goodfellow to come speak with Cedric if he had questions about why. CO Goodfellow testified that he received the message from Captain McDonald, but did not immediately go speak with Cedric because CO Goodfellow was "iffy" about the ticket after he wrote it.

At 9:07 a.m. on August 27, 2017, Cedric responded to Cheeks' text message with a call from his office telephone. The conversation was brief, and Cedric testified that he told Cheeks that the issues would be handled internally. He instructed her to call the appropriate prison staff to see if she was permitted to visit in the future.

At some point in August or September 2017, Deputy Warden Schooley contacted IA Investigator Cusack to ask about the progress of the investigation into the burgeoning issues related to the Prisoner Demorest incident. IA Investigator Cusack testified that he was instructed by a superior officer that he could respond to Deputy Warden Schooley's contact and provide an update considering the unusual delay in the investigation. IA Investigator Cusack testified that he spoke with Deputy Warden Schooley and told him that the report still was being prepared, but the portion related to Deputy Warden Schooley was complete.

In the same time period, Deputy Warden Schooley became interested in Cedric's involvement in the decision not to review the misconduct ticket for Prisoner Harding-Bey. Deputy Warden Schooley asked one of the employees he directly supervised to review Prisoner Harding-Bey's jailhouse telephone calls, and upon doing so, the employee found a call in which Prisoner Harding-Bey called Cheeks shortly after the incident in the visiting room. In the call, Prisoner Harding-Bey said that he believed a particular CO was acting in a biased manner toward him, and would speak with Warden Chapman, Inspector Douglas, and Deputy Warden Schooley to attempt to remedy the situation. Prisoner Harding-Bey also asked Cheeks to contact Cedric for help with the visitor restriction. Believing this to support some form of improper activity by Cedric, Deputy Warden Schooley provided the telephone call recording to Warden Chapman. In response, Warden Chapman sent an investigation request to IA Manager Marschke. In the message to IA Manager Marschke, Warden Chapman only told IA Manager Marschke about Prisoner Harding-Bey's references to Inspector Douglas and Cedric, omitting that Prisoner Harding-Bey also mentioned Deputy Warden Schooley and Warden Chapman.

On September 26, 2017, IA Investigator Cusack submitted his report regarding his investigation into the Prisoner Demorest incident. IA Investigator Cusack recommended Deputy Warden Schooley and Acting-Warden Stephenson not be charged with any violations. IA Investigator Cusack believed that Deputy Warden Schooley's secretary would have heard Deputy Warden Schooley yelling at Lieutenants Miller and Whitman if such actually occurred. IA Investigator Cusack also recommended that Lieutenants Miller and Whitman be charged with a number of work-rule and policy violations related to their sharing of questionnaire answers, as shown by their e-mails, and later decisions to lie about sharing answers when questioned by IA

Investigator Cusack. As for Cedric, IA Investigator Cusack recommended the same charges, which included not maintaining confidentiality of records, failing to report violations of work rules, lying during an investigation when he denied sharing answers with Lieutenant Miller, and conduct unbecoming of an employee of defendant. These charges included "asterisk rules," which were punishable by termination of employment.

As required, IA Investigator Cusack's report was forwarded to IA Manager Marschke for review. IA Manager Marschke approved the investigation and recommended charges for the reasons identified by IA Investigator Cusack, which Administrator Warner also approved. Sometime after submitting his report, IA Investigator Cusack was once again contacted by Deputy Warden Schooley for an update. IA Investigator Cusack told Deputy Warden Schooley that there was insufficient evidence regarding the allegations against him, so he was in the clear. He also noted, though, that the charges against Cedric would go forward.

For his part, Cedric insisted that he did not collude with Lieutenants Miller and Whitman during the investigation. Cedric noted that it was not surprising that their answers sounded the same because they witnessed the same events. Cedric found it telling that IA Investigator Cusack would rely on statements from Deputy Warden Schooley's secretary, who undoubtedly had reason to lie on his behalf, when two lieutenants and a deputy warden said the opposite. Cedric further denied receiving information from Lieutenant Miller about his answers to the questionnaire because he did not request the e-mail and he likely deleted it as soon as he received it, did not open the attachment, and promptly forgot about it.

At this point, the issue regarding Cedric ordering Prisoner Harding-Bey's misconduct ticket not to be reviewed was still outstanding, and IA Manager Marschke, with approval from Administrator Warner, had decided to conduct the investigation himself. IA Manager Marschke came to TCF to interview all of the witnesses involved in the case. When he asked Cedric if he had been in contact with Cheeks before deciding not to review the misconduct ticket related to Prisoner Harding-Bey, Cedric said he had not. Cedric did inform IA Manager Marschke he received a call from Cheeks after making the decision, though, saying that the call came in at about 10:00 a.m. IA Manager Marschke collected Cedric's cell phone and office telephone records to review his claims. In the records, he found that Cheeks' text message came in at 7:24 a.m., which was before Cedric arrived at work. Thus, despite not having data regarding when the text message was opened, IA Manager Marschke determined that Cedric had lied during the investigation. Further, because Cedric's office telephone records showed that he had called Cheeks, instead of the other way around, at 9:07 a.m., instead of 10:00 a.m., IA Manager Marschke determined that Cedric was lying about those claims as well. IA Manager Marschke also concluded that CO Goodfellow's ticket was worthy of review and Cedric's decision to the contrary violated policy. Further, according to IA Manager Marschke, Cedric violated an additional policy because he did not speak with CO Goodfellow before removing the ticket from the review process. IA Manager Marschke also determined that Cedric should have reported the contact from Cheeks to his supervisor, Warden Chapman, but failed to do so. Lastly, IA Manager Marschke found Cedric to have overfamiliarity with Cheeks, a prisoner's girlfriend, considering his apparent response of helping Cheeks with her issues after being contacted outside of work hours. For the overfamiliarity charge, IA Manager Marschke also relied on the jailhouse telephone call between Prisoner Harding-Bey and Cheeks, during which Cedric's name was mentioned.

For his part, Cedric admitted that he may have been incorrect about times and the sequence of events, but denied that he purposefully lied. Instead, he gave IA Manager Marschke his best estimate, which happened to be wrong. Cedric also explained that he did not mention the text message to IA Manager Marschke at first because he thought the questions specifically related to *speaking* with Cheeks. Cedric opined that if he had been asked to clarify his answers with the benefit of reviewing his telephone and cell phone records, he would have acknowledged his previous, innocent errors. Further, Cedric explained that he received about 30 calls per day from the family and friends of prisoners, and so he believed it was ridiculous to expect him to remember the exact timing and sequence of his contacts with Cheeks. Cedric stood by his decision that the misconduct ticket should not have been reviewed and the visitor restriction revoked, and contended that he was not required to speak with CO Goodfellow under the circumstances. As for IA Manager Marschke's determination that Cedric should have reported the contacts from Cheeks to Warden Chapman, Cedric thought the determination was ridiculous because, again, Cedric received about 30 calls per day from prisoners' family and friends and, thus, Warden Chapman would be overrun with official reports of contacts if such were required. As to the evidence of the jailhouse call between Cheeks and Prisoner Harding-Bey, Cedric pondered why IA Manager Marschke did not take greater interest in Prisoner Harding-Bey's claim that he would speak with Deputy Warden Schooley and Warden Chapman to sort out his visitor restriction. Cedric surmised that this investigation and the resulting determinations were a sham done in retaliation for his support of Lisa's harassment claims and lawsuit.

The charges stemming from IA Manager Marschke's investigation also included violations for "asterisk" rules, which, again, permitted termination of employment as a punishment. Because IA Manager Marschke conducted the investigation himself, he submitted his report to Administrator Warner, who approved the charges. At about the same time, IA Manager Marschke approved the charges recommended by IA Investigator Cusack. With all of the charges being approved at around the same time, the hearings regarding the various charges against Cedric were scheduled to occur on the same day, November 21, 2017.

Just one week before the hearings, though, another investigation-spawning event occurred. On November 15, 2017, CO Voight, whose first name was not provided on the record, arrived to work at TCF while Cedric was not in the building. While proceeding through security during a shakedown, CO Voight removed an unopened 5-Hour Energy drink from his pocket. CO Voight did not try to hide it; he believed he was permitted to bring it into work. Recently, though, the TCF manifest had changed to disallow 5-Hour Energy drinks from being brought in. Thus, CO Voight was found to have brought in contraband. Consequently, Captain Andrew Dyer wrote up CO Voight for the misconduct.

Later, though, on his way home, Captain Dyer wondered whether he should have prepared a critical incident report regarding CO Voight's rule violation. Testimony at trial established that critical incident reports typically were prepared for incredibly serious events, such as a prisoner assaulting or killing another prisoner. As the result of another policy change, though, critical incident reports were now required when there was an attempt to bring in contraband. Before the policy change, COs were permitted to take items back to their cars when they accidentally kept contraband items on their person when walking into the prison.

-18-

In any event, Captain Dyer, concerned he had forgotten to write a critical incident report, called Assistant Deputy Warden (ADW) Ora Carter, who was the shift commander on duty at the time. Captain Dyer asked ADW Carter to call Cedric at home to ask if a critical incident report should be written for CO Voight. ADW Carter followed the instructions, despite being in the same room as the policy manual, which established when such reports were required. According to ADW Carter, Cedric answered the call and told ADW Carter a critical incident report was not required. Cedric testified that he told Captain Dyer and ADW Carter to look at the policy, but he did not believe it sounded like a critical incident. Shortly thereafter, Captain Dyer submitted a request for an investigation related to Cedric's failure to require a critical incident report. Cedric expressed confusion regarding why Captain Dyer chose to submit for an investigation instead of just writing the critical incident report when he discovered it was required. IA Manager Marschke assigned that investigation to IA Investigator Vicki Dahlke.

On November 21, 2017, the disciplinary conferences for the already-approved charges against Cedric were held. The conferences were presided over by Assistant Deputy Director Robert Napel, who reviewed the packets of information prepared by IA Manager Marschke and IA Investigator Cusack. At the first conference, which related to the charges arising out of the Prisoner Demorest issue, Cedric did his best to defend himself, but Assistant Deputy Director Napel was not convinced. Thus, after considering the evidence, Assistant Deputy Director Napel found Cedric to be guilty of all of the charges brought against him by IA Investigator Cusack.

The disciplinary conference regarding Cedric's decision not to review the misconduct ticket related to Prisoner Harding-Bey was held immediately afterward. Assistant Deputy Director Napel believed Cedric should have spoken with CO Goodfellow before deciding not to review the ticket, should have reported his inappropriate contacts with Cheeks to Warden Chapman, and was deceptive during the investigation. Assistant Deputy Director Napel also noted that Warden Chapman had stated that he thought the ticket written by CO Goodfellow should have been reviewed with Prisoner Harding-Bey. Moreover, regardless of who agreed with Cedric's decision to stop the ticket from being reviewed, Assistant Deputy Director Napel noted that it must be attributed to Cedric as the highest-ranking official involved. Consequently, Assistant Deputy Director Napel again found Cedric guilty of all of the charges against him.

Cedric described the disciplinary conferences as a "kangaroo court," noting that he believed Assistant Deputy Director Napel had already decided against Cedric before the proceedings even began.

Because Cedric had been found to have violated some asterisk rules, Assistant Deputy Director Napel had to consider whether Cedric should be put on "stop order" pending a decision on discipline from Jennifer Nanasy, defendant's discipline coordinator. A "stop order" barred an individual from coming into the prison and required a photograph of the offender to be placed at all prison entrances. Cedric described a "stop order" as one of the most embarrassing things that could happen to an employee. To obtain guidance on whether he should issue a "stop order" for Cedric, Assistant Deputy Director Napel contacted someone at defendant's headquarters in Lansing, though he could not recall whom. He testified that it was either Discipline Coordinator Nanasy or Administrator Warner. After speaking with the person, Assistant Deputy Director Napel decided to place Cedric on "stop order." Therefore, as of that moment, Cedric was no longer permitted to come to work.

On December 14, 2017, Cedric decided to follow Lisa's lead and saw Dr. Rubenfaer for psychiatric care. Dr. Rubenfaer conducted a psychiatric evaluation of Cedric and diagnosed him with "severe adjustment disorder with depressed and anxious mood caused by events in the workplace and events that occurred to his wife in the workplace." Dr. Rubenfaer noted that Cedric complained of anxiety, depression, anger, mood swings, panic attacks, feelings of distrust and paranoia, lack of drive, devastation, and an overall inability to function. Dr. Rubenfaer opined that Cedric's issues had been caused by the harassment Lisa suffered at work, his inability to help her with those problems, and the resultant retaliation against Cedric for supporting Lisa. Dr. Rubenfaer stated that medication and therapy were the proper treatments for Cedric's psychiatric issues. The next day, December 15, 2017, Cedric saw Harris again for therapy, although it would be his last visit before a lengthy hiatus. Harris generally agreed with Dr. Rubenfaer's summary of Cedric's mental and emotional state at the time.

Shortly thereafter, Cedric looked at all the charges of which he had been found guilty and the "stop order" issued against him, and decided that the writing was on the wall—his employment would be terminated. He reached this conclusion despite not yet being aware of the impending charges regarding the 5-Hour Energy drink incident. Concerned about losing his pension and having difficulty finding a different job if he was fired, Cedric decided he had no other option than to retire early, before defendant could issue its discipline. Cedric testified that about 90% of people lost their jobs after a "stop order" had been issued, but agreed that termination was not required in response to such. Cedric's official retirement date was December 31, 2017. Afterward, Administrator Warner obtained the reports regarding Cedric, which had been in the possession of Discipline Coordinator Nanasy, and added a note that Cedric would have been disciplined but for his retirement. Neither Administrator Warner nor Discipline Coordinator Nanasy would say what discipline would have been issued for Cedric.

While IA Investigator Dahlke's investigation into the 5-Hour Energy drink incident continued, Cedric did not participate in it. When the investigation was completed, Cedric was found to have violated work rules regarding critical incident reports. Captain Dyer, who had actually been in the building during the events at issue, was cleared of all charges because he said he was instructed by Cedric not to create a critical incident report. IA Manager Marschke signed off on the investigation and recommended charges.

On March 8, 2018, after obtaining leave from the trial court, plaintiffs amended their complaint. Most relevantly, plaintiffs added a claim of retaliation under the CRA on behalf of Cedric. Plaintiffs alleged that defendant had learned of Cedric's involvement in Lisa's lawsuit and harassment complaints, came up with questionable charges to punish Cedric for his support of Lisa, and piled one on top of the other to ensure that he would be terminated for his participation in the embarrassment of defendant. Both plaintiffs sought significant economic and noneconomic damages in the amended complaint.

On January 7, 2019, Cedric had his last visit with Dr. Rubenfaer, who, at trial, testified that Cedric's condition had worsened. Instead of an adjustment disorder, Dr. Rubenfaer opined that Cedric was now suffering from PTSD. Dr. Rubenfaer testified that there was no cure for PTSD, and the only treatment course was to stop it from getting worse. Absent medication and therapy, Cedric would be at the risk of becoming self-injurious and even suicidal. Dr. Rubenfaer believed that Cedric's issues were caused by the events at work and had become chronic, which he

explained meant that "the likelihood of improvement is unlikely, that it's—that it's no longer treatable in a standard way but it's [going to] need ongoing, long-term psychiatric care, both . . . psychotherapy by a therapist who does talking therapy on a weekly basis and by a psychiatrist who would prescribe medications." Dr. Rubenfaer testified that he did not believe Cedric was embellishing or malingering.

In April 2019, Dr. Shiener, who had initially performed a psychiatric evaluation of Cedric in January 2017, reevaluated Cedric to see how his mental health had progressed over the preceding two years. Dr. Shiener found that Cedric's condition had worsened and, agreeing with Dr. Rubenfaer and Harris,[12] become chronic. Despite taking medications, Cedric still struggled with sleep, ruminative thoughts, and a lack of sex drive, while he was feeling more distressed and disturbed. Dr. Shiener opined that Cedric's condition had progressed to become PTSD, noting that Cedric was dealing with hallmark symptoms of PTSD including flashbacks and phobic avoidance of issues related to work. While Dr. Shiener testified that he was not a lie detector, he believed Cedric was suffering from PTSD as a result of defendant's retaliation "within a reasonable degree of medical certainty." Dr. Shiener stated that Cedric's mental ailments likely would lead to lifelong physical problems, including "muscle aches and pains, temporomandibular joint [issues], clenching your teeth, headaches because of the tension that you carry in your neck and shoulders, sore throats because of clenching your teeth," and an ulcer. Dr. Shiener noted that PTSD often caused permanent chemical changes to the brain, which led to extreme reactions to otherwise minimal stimuli. According to Dr. Shiener, there was little chance of improvement for Cedric, and he would need lifelong medication and therapy to avoid getting worse. Dr. Shiener opined that, should his condition go untreated, Cedric would be at significant risk of suicide.

Cedric agreed that his life had been changed by the retaliation he faced in response to his support of Lisa's claims against defendant. According to Cedric, their lives had become dominated by the harassment and retaliation, their marriage had worsened as a result, he did not feel like the same person, and he struggled to sleep. Without medications, he was only able to sleep about two hours per night. Cedric also reported that plaintiffs' friends who worked for defendant stopped speaking with them. He felt devastated after being forced out of his job and feeling like he could not help Lisa, stating, "I just feel like I let my wife down and there's been times that I ain't even want to live."

Cedric acknowledged that he had considered retirement in the past, including in an e-mail when he expressed plans to retire in 2018, which predated the events of this case. However, at trial, he insisted that those plans were flexible, and he had always believed that he would be a warden one day. Cedric testified that, absent Lisa's harassment complaint and their lawsuit, he still would be employed by defendant, and likely would be a warden. This was the case even though warden positions were extremely competitive and he had been passed over for previous openings. Cedric said that since being forced out of his employment, Cedric had taken work as a security guard for a hospital, and later, as a detective with a private firm. Cedric testified that he made about the same amount of money when his new jobs were added to income from his pension,

---

[12] Harris testified that his final visit with Cedric was in May 2019, at which time Cedric still was suffering from the same chronic issues related to PTSD, depression, and anxiety.

-21-

but doing the new work was terrible for him. Cedric's medical providers opined that Cedric having to work several jobs to earn similar pay was detrimental to his ability to access treatment for his PTSD and depression. Harris opined that Cedric being forced out of his dream job and then required to work jobs he did not love caused "depression, anxiety, low self-worth, angry, irritable, social withdrawal, and I'm sure it's affecting him in other areas."

## C. VERDICT

A month after trial began, and after multiple days of deliberations, the jury reached a verdict. For Lisa's disparate treatment claim under the CRA, the jury determined that she suffered an adverse employment action on the basis of race for which defendant was legally responsible. The jury also determined that Lisa was subjected to unwelcome communication or conduct on the basis of race, such conduct or contact interfered with her employment and created a hostile work environment, defendant was legally responsible for the consequences, and Lisa suffered damages as a result.[13] The jury awarded Lisa $25,000 for past economic damages, $857,189 for future economic damages, $2.75 million for past emotional distress, and $1.5 million for future emotional distress. In total, the jury found Lisa suffered $5,132,189 in economic and noneconomic damages.

With respect to Cedric, the jury determined that he was subject to an adverse employment action, which was causally connected to Cedric's protected activities under the CRA. The jury did not award Cedric any past economic damages, but did award him $1.9 million in future economic damages, $1.85 million for past emotional distress, and $2.5 million for future emotional distress. The total award for Cedric, then, was $6.25 million in economic and noneconomic damages. The combined award for both plaintiffs was $11,382,189. On September 23, 2019, the trial court entered a judgment on the jury's verdict, along with interest, which brought the total award to $11,670,128.33.

Defendant now appeals.

## II. JNOV ON LISA'S CLAIMS

After trial, defendant moved for JNOV on both of Lisa's claims. For her disparate treatment claim, defendant argued that Lisa failed to submit evidence that she established an adverse employment action. For both Lisa's disparate treatment and hostile work environment claims, defendant alleged that Lisa failed to submit evidence establishing that defendant was liable under a theory of respondeat superior. The trial court disagreed with defendant on both arguments and denied defendant's motion for JNOV. On appeal, defendant raises the same arguments it did before the trial court. We need not reach the first argument because we conclude that Lisa submitted sufficient evidence to establish respondeat superior, and thus, at the very least, she was entitled to recovery on her hostile work environment claim, and the damages awarded by the jury did not differentiate between Lisa's differing claims.

---

[13] The jury also decided defendant had not retaliated against Lisa.

-22-

## A. STANDARD OF REVIEW

"This Court reviews de novo a trial court's decisions regarding motions for JNOV." *Hecht v Nat'l Heritage Academies, Inc*, 499 Mich 586, 604; 886 NW2d 135 (2016). When considering a motion for JNOV, "[t]he appellate court is to review the evidence and all legitimate inferences in the light most favorable to the nonmoving party." *Id*. (quotation marks and citation omitted). "Only if the evidence so viewed fails to establish a claim as a matter of law, should the motion be granted." *Id*. (quotation marks and citation omitted).

## B. RELEVANT LAW

This Court, in *Major v Village of Newberry*, 316 Mich App 527, 550; 892 NW2d 402 (2016), summarized the five elements required to be proven to make a prima facie case of hostile work environment:

> (1) the employee belonged to a protected group; (2) the employee was subjected to communication or conduct on the basis of the protected status; (3) the employee was subjected to unwelcome conduct or communication on the basis of the protected status; (4) the unwelcome conduct or communication was intended to, or in fact did, interfere substantially with the employee's employment or created an intimidating, hostile, or offensive work environment; and (5) respondeat superior.

Defendant only contends that plaintiffs failed to prove the final element of Lisa's hostile work environment claim—respondeat superior.

As explained by our Supreme Court, "in cases involving a hostile work environment claim, a plaintiff must show some *fault* on the part of the employer" in order for that employer to be liable. *Chambers v Trettco, Inc*, 463 Mich 297, 312; 614 NW2d 910 (2000). When, as here, a hostile work environment is alleged to have "been created because unwelcome . . . communication or conduct substantially interferes with an individual's employment, the violation can only be attributed to the employer if the employer failed to take prompt and adequate remedial action after having been reasonably put on notice of the harassment." *Id*. at 313. In other words, an employer "must have notice of alleged harassment before being held liable for not implementing action." *Radtke v Everett*, 442 Mich 368, 396; 501 NW2d 155 (1993). Such notice can be actual or constructive. *Sheridan v Forest Hills Pub Sch*, 247 Mich App 611, 621; 637 NW2d 536 (2001). An employer will be deemed to have constructive notice "if, by an objective standard, the totality of the circumstances were such that a reasonable employer would have been aware of a substantial probability that . . . harassment was occurring." *Chambers*, 463 Mich at 319. "However, if an employer is accused of [the] harassment, then the respondeat superior inquiry is unnecessary because holding an employer liable for personal actions is not unfair." *Radtke*, 442 Mich at 397.

## C. ANALYSIS

Defendant has consistently argued that Lisa is unable to establish the respondeat superior element of her hostile work environment claim because defendant first received notice that Lisa was being harassed when she filed her complaint on August 3, 2016, and defendant immediately

took remedial actions. Defendant made this argument before trial in a motion for summary disposition, made the argument again when it moved for a directed verdict following plaintiffs' case-in-chief, raised the argument in its motion for JNOV following trial, and continues to raise the argument on appeal.

In response, plaintiffs consistently argued below that a respondeat superior inquiry was unnecessary because, functionally, Lisa's employer was accused of harassment since Supervisor Slater was involved in at least three of the reported instances of harassment. Plaintiffs argued alternatively that, assuming the respondeat superior inquiry was necessary, defendant had constructive notice of the harassment because the harassment was so pervasive that a reasonable employer would have been aware that it was occurring, especially considering that Supervisor Slater was involved in or witnessed several of the instances of harassment. In general, we agree with both arguments.

In *Sheridan*, 247 Mich App at 621-622, this Court explained that an "employee can demonstrate that the employer knew of the harassment by showing that she complained to higher management of the harassment," and defined "higher management" as "someone in the employer's chain of command who possesses the ability to exercise significant influence in the decision-making process of hiring, firing, and disciplining the offensive employee." Viewing the evidence in the light most favorable to plaintiffs, as we must, we conclude that Supervisor Slater meets this definition of higher management.

It was undisputed that Supervisor Slater was the highest-ranking official of defendant working in the building in which defendant's Lapeer parole and probation office was located. In addition to supervising defendant's Lapeer office, Supervisor Slater also supervised the Sanilac County parole and probation office. Although Supervisor Slater testified that he did not personally choose Lisa for the position, it was implied that his lack of say in hiring Lisa was unusual. Even so, Lisa testified that she had a telephone interview with Supervisor Slater before being transferred to the Lapeer office from Macomb County.

When Lisa started in Lapeer, Supervisor Slater instructed Lisa that her primary job would be to prepare PSIRs for the Lapeer office. Supervisor Slater testified that he was trying a new system where only one agent worked on PSIRs, which he believed would allow for a steady income of PSIRs instead of all of them being submitted in heaps. Lisa additionally was told by Supervisor Slater that she was required to write some PSIRs for the Sanilac office, which happened to be understaffed at that time. Therefore, at the sole direction of Supervisor Slater, Lisa was required to have the exclusive job of writing PSIRs and to drive to the Sanilac office, which was about one hour away.

When Lisa made her official report of racial harassment to Supervisor Slater on August 3, 2016, after she was called "mammy" by Kraft, Supervisor Slater immediately called Kraft to have her explain what happened. When Kraft said that it had been a slip of her tongue, Supervisor Slater believed her and directed her to apologize to Lisa. According to Lisa, Kraft's apology and explanation were not believable. Even so, when Supervisor Slater called Lisa, he believed he had remedied her issues of racial harassment. Lisa, who was worried about speaking with Supervisor Slater because of his involvement in some of her racial harassment concerns, told him Kraft's apparently insincere apology had not been a cure-all. They agreed to speak in person when

-24-

Supervisor Slater would be back in Lapeer. At the ensuing in-person meeting, Lisa detailed additional instances of harassment that she had endured while at the Lapeer office. After meeting with Lisa, Supervisor Slater called each member of the staff into his office to discuss defendant's discriminatory harassment policies.

Eventually, Lisa decided to transfer to the Flint office of defendant's parole and probation department to escape the racially hostile work environment in Lapeer. When she transferred, she was instructed by Supervisor Slater that she was required to complete PSIRs for the Lapeer office that she had already started. Thus, even when working in a different county, some of Lisa's work duties were being determined by Supervisor Slater.

The foregoing supports that Supervisor Slater fit the definition of higher management, and thus, qualified as Lisa's employer for purposes of respondeat superior analysis. First, Supervisor Slater's own testimony showed that he had at least some sway in regard to who was hired in the Lapeer office of defendant's parole and probation department. It was remarked that Lisa being hired to work in the office, without his express approval, was unusual. This, then, allowed for an inference that, generally, Supervisor Slater was involved in the decision regarding whom to hire.

Second, Supervisor Slater was undisputedly involved in Lisa's job assignments. He ordered her to complete PSIRs as her sole duties while working in the Lapeer office, he demanded she drive to the Sanilac office when it was short-staffed, and he instructed her to complete PSIRs for the Lapeer office even after she had transferred to Flint. There was no testimony about any other individual deciding Lisa's work duties when she worked in the Lapeer office.

Third, Supervisor Slater was involved in the discipline of employees at the Lapeer office. When he was informed of Kraft's use of the term "mammy," he determined her sole discipline would be to make an apology to Lisa. When he was told by Lisa that this was insufficient, he called each member of the staff into his office to discuss defendant's discriminatory harassment policies with them.

As for Supervisor Slater's involvement in the decision-making process related to what employees were paid and whether they were fired, there simply was little evidence on those topics one way or the other. It is hard to imagine, though, that defendant's highest-ranking official in its Lapeer parole and probation office, who actually was able to observe the employees he supervised, was not (1) significantly involved in whether employees were fired and (2) had significant influence in the process for determining who was considered for raises or other pay considerations. We therefore conclude that, when viewing the record in the light most favorable to plaintiff, Supervisor Slater was "higher management" for purposes of the respondeat superior analysis for a claim of hostile work environment under the CRA.

"Because these 'higher management' employees are vested by the employer with actual authority to effectuate change in the workplace, principles of agency law support the conclusion that the knowledge they possess regarding conditions in the workplace would properly be imputed to the employer." *Sheridan*, 247 Mich App at 623. It follows that, if these "higher management" employees are involved in the harassment, then the respondeat superior inquiry is unnecessary because the employer would necessarily be imputed with actual knowledge of the harassment. See *Radtke*, 442 Mich at 397.

Viewing the evidence in the light most favorable to plaintiff, Supervisor Slater was present for, or involved in, multiple instances of racial harassment of Lisa prior to her August 3, 2016 complaint. Briefly, Supervisor Slater was present when Agent Avolio played the Sweet Brown video in the lunchroom. Supervisor Slater also was part of the conversation when either he or Kraft said that Africans were good runners because they had to run for food. Supervisor Slater himself was the individual who asked Lisa if she wanted chitterlings on her pizza, and told Lisa's coworkers that he did not know what he was getting with Lisa, which Lisa believed was racially motivated because he said that he was confident her white male counterpart, who Supervisor Slater was also introducing at the time, would be a good agent. Because Supervisor Slater was either aware of or involved in these instances of racial harassment, and because of his status as "higher management," defendant either (1) had actual knowledge of the racial harassment before Lisa filed her August 3, 2016 complaint because Supervisor Slater had actual knowledge of the racial harassment, see *Sheridan*, 247 Mich App at 623, or (2) the respondeat superior inquiry is unnecessary in the first instance "because holding an employer liable for personal actions is not unfair," *Radtke*, 442 Mich at 397.

Alternatively, viewing the evidence in the light most favorable to plaintiffs, a jury could reasonably conclude that defendant had constructive notice of the harassment before Lisa filed her August 3, 2016 complaint. On top of the incidents described above, which dated back to Lisa's first day at the Lapeer Office, Lisa outlined numerous other instances of racial harassment, including being singled out by Agent Shephard for being black and Agent Shephard referring to Lisa as "the black one"; Agent Zolinski asking Lisa what she thought of Agent Zolinski's relatives adopting a black child when their last name was "Kuhns"; and Agent Olson describing Lisa as "scary" and showing Lisa a racially offensive video. Further, it was generally agreed upon by witnesses that defendant's Lapeer parole and probation office was small, allowing conversations to be overheard from other parts of the office. From the foregoing, an objective view of the totality of the circumstances, viewed in a light most favorable to plaintiffs, supported that Supervisor Slater, as higher management, "would have been aware of a substantial probability that . . . harassment was occurring." *Chambers*, 463 Mich at 319. Thus, the jury's decision that defendant had notice—specifically constructive notice—was not subject to JNOV.

Next, defendant argues that its response, when it received notice, was prompt and adequate, which relieved it of liability related to Lisa's complaint of a hostile work environment. Defendant's argument, however, relies on notice being provided in August 2016, instead of well before that, as just determined. We therefore need not address this argument at length. As just explained, Lisa testified that the harassment leading to a hostile work environment began nearly as soon as she started in Lapeer, which was in November 2014. Viewing the evidence in the light most favorable to plaintiff, defendant's notice occurred well before August 2016, and all of the remedial actions that defendant points to on appeal happened after Lisa filed her formal complaint on August 3, 2016. Because the response of defendant was not prompt, defendant was not entitled to protection under the CRA for Lisa's claim of a hostile work environment. See *Radtke*, 442 Mich at 396 (holding an employer may avoid liability where its response to notice of harassment is both prompt and appropriate).

## III. JNOV ON CEDRIC'S CLAIM

Like with Lisa's claims, after the jury found in favor of plaintiffs on Cedric's retaliation claim, defendant moved for JNOV on that claim. In relevant part, defendant argued that it was entitled to JNOV on Cedric's retaliation claim because Cedric failed to prove a causal connection between his protected activity and the adverse employment action taken against him. We disagree.

## A. STANDARD OF REVIEW

"This Court reviews de novo a trial court's decisions regarding motions for JNOV." *Hecht*, 499 Mich at 604. When considering a motion for JNOV, "[t]he appellate court is to review the evidence and all legitimate inferences in the light most favorable to the nonmoving party." *Id.* (quotation marks and citation omitted). "Only if the evidence so viewed fails to establish a claim as a matter of law, should the motion be granted." *Id.* (quotation marks and citation omitted).

## B. ANALYSIS

Michigan's CRA "prohibits employers from discriminating on the basis of race." *White v Dep't of Transp*, 334 Mich App 98, 107; 964 NW2d 88 (2020). That statute, in pertinent part, states:

> (1) An employer shall not do any of the following:
>
> (a) Fail or refuse to hire or recruit, discharge, or otherwise discriminate against an individual with respect to employment, compensation, or a term, condition, or privilege of employment, because of religion, race, color, national origin, age, sex, height, weight, or marital status. [MCL 37.2202(1)(a).]

As relevant to Cedric's claim, the CRA also prohibits a person or entity from "[r]etaliat[ing] or discriminat[ing] against a person because the person has opposed a violation of this act, or because the person has made a charge, filed a complaint, testified, assisted, or participated in an investigation, proceeding, or hearing under this act." MCL 37.2701(a).

> "[T]o establish a prima facie case of unlawful retaliation under the [CRA], a plaintiff must show (1) that he engaged in a protected activity; (2) that this was known by the defendant; (3) that the defendant took an employment action adverse to the plaintiff; and (4) that there was a causal connection between the protected activity and the adverse employment action." [*El-Khalil v Oakwood Healthcare, Inc*, 504 Mich 152, 161; 934 NW2d 665 (2019), quoting *Rymal v Baergen*, 261 Mich App 274, 300; 686 NW2d 241 (2004).]

On appeal, defendant only challenges the fourth element of Cedric's retaliation claim—causation.

"To establish causation, the plaintiff must show that his participation in activity protected by the CRA was a 'significant factor' in the employer's adverse employment action, not just that there was a causal link between the two." *Rymal*, 262 Mich App at 303. Our Supreme Court has

explained that, "in order to show causation in a retaliatory discrimination case, '[p]laintiff must show something more than merely a coincidence in time between protected activity and adverse employment action.' " *Garg v Macomb Co Comm Mental Health Servs*, 472 Mich 263, 286; 696 NW2d 646 (2005), quoting *West v Gen Motors Corp*, 469 Mich 177 ,186; 665 NW2d 468 (2003). However, close temporal proximity between the protected activity and adverse actions can still be evidence of a causal connection so long as that and other circumstantial evidence, taken as a whole, "would enable a reasonable fact-finder to infer that an action had a discriminatory or retaliatory basis." *Rymal*, 262 Mich App at 303.

Defendant contends that plaintiffs have relied solely on evidence of temporal proximity—evidence establishing that the investigations into Cedric started right after Lisa complained, and ramped up after plaintiffs filed their lawsuit—to establish causation, which is not permitted under *Garg*, 472 Mich at 286. Defendant is correct in that plaintiffs presented ample evidence establishing the temporal proximity between the protected activity and the adverse actions. Before Lisa's complaint and the ensuing lawsuit, Cedric was a valued employee who had been promoted numerous times over his 27-year career, had received numerous awards and letters of commendation from various supervisors, and had never been the subject of disciplinary action by defendant. Lisa made her official complaint of racial harassment on August 3, 2016, and plaintiffs filed their original complaint on February 3, 2017. In the months following these events, Cedric was the subject of three investigations, charged with more than 10 work-rule violations, found guilty in disciplinary conferences regarding two of the investigations, placed on "stop order," and decided to retire before defendant could issue its discipline, which Cedric was certain would have been termination of his employment. In light of that evidence, certainly, there was significant proof of temporal proximity between Cedric's engagement in the protected activity of participating in Lisa's racial harassment complaints under the CRA and the adverse employment action of a constructive discharge.

Plaintiffs, however, did not rely solely on evidence of temporal proximity to establish the causation element of Cedric's retaliation claim. The record, viewed in a light most favorable to plaintiffs, shows a plethora of questionable circumstances supporting plaintiffs' contention that defendant's true purpose in investigating and disciplining Cedric was retaliation.

Initially, though, we note that our Supreme Court in *Garg*, 472 Mich at 286, in deciding that temporal proximity, on its own, was not enough to establish a causal connection, relied on *West*, 469 Mich at 186, which was a case alleging a retaliatory discharge in violation of the Whistleblowers' Protection Act (WPA), MCL 15.361 *et seq*., not the CRA. The Court in *Garg*, 472 Mich at 277 n 5, reasoned that its reliance on a case involving the WPA was permissible because "whistleblower statute[s] [are] analogous to antiretaliation provisions of other employment discrimination statutes . . . ." (Quotation marks and citation omitted, alterations in original.) We find this meaningful because the Court in *West*, 469 Mich at 186-187, referred to an opinion of this Court, *Henry v Detroit*, 234 Mich App 405, 414; 594 NW2d 107 (1999), as an example of circumstances that, in addition to temporal proximity, could create a jury question regarding causal connection. The Court in *West* explained that the plaintiff in *Henry* had been successful because, in addition to temporal proximity, the plaintiff "presented evidence that his superior expressed clear displeasure with the protected activity engaged in by the plaintiff," the "plaintiff's record was impeccable or unblemished [before the protected activity] . . . [and] the discipline imposed was seemingly undeserved . . . ." *West*, 469 Mich at 186-187, citing *Henry*,

234 Mich App at 414. As will be discussed, the record supports that Cedric's situation is far more analogous to *Henry* than it is to *West*.

First, and potentially most damaging for defendant, was Lisa's testimony about her conversation with Assistant Deputy Director Blakely after she made her official complaints of harassment. Testimony established that Cedric had spoken with Assistant Deputy Director Blakely about Lisa's complaint and Cedric's support for Lisa. Then, according to Lisa, during a telephone call with Assistant Deputy Director Blakely, the assistant deputy director told Lisa that he would be processing her transfer to Flint as soon as possible because Assistant Deputy Director Blakely had spoken with someone at defendant's headquarters and he believed that defendant was "circling the wagons."[14] When asked what she thought Assistant Deputy Director Blakely meant by his use of the phrase, Lisa testified, "I believe that he meant they, as in [defendant's representatives in] Lansing, they are circling the wagons, this is going to get worse for you guys." Lisa said that her understanding was cemented when Cedric began facing a number of charges and investigations.

The evidence of Assistant Deputy Director Blakely stating that defendant was circling the wagons in response to Lisa's complaints of racial harassment was circumstantial evidence of defendant being upset about the situation. In other words, it permitted an inference that defendant was not interested in helping plaintiffs, but instead was displeased by the harassment complaints. As discussed in *West*, 469 Mich at 186-187, an expression of displeasure from a superior officer regarding engagement in a protected activity is an additional factor supporting the existence of causal connection. Therefore, in addition to temporal proximity, there was circumstantial evidence supporting that defendant was upset with Lisa's complaints of racial harassment and Cedric's support of them, which weighed in favor of denying JNOV.

Second, plaintiffs presented evidence, as briefly summarized above, of Cedric's work history with defendant. Quite simply, Cedric's 27-year career with defendant was littered with promotions, letters of commendation, and awards. Before plaintiffs began pursuing complaints of racial harassment and filed their lawsuit, Cedric had never been subjected to disciplinary action by defendant. Almost all of the witnesses at trial, including those who disagreed with some of Cedric's decisions, testified that Cedric was a model employee and a great supervisor. They knew him to follow the rules and to be honest. Stated differently, the evidence at trial showed Cedric's "record was impeccable or unblemished before" he began engaging in protected activity under the CRA. *West*, 469 Mich at 187 (quotation marks and citation omitted). Consequently, this was additional circumstantial evidence supporting that the reason for Cedric's investigations and imminent disciplines were not actually motivated by his alleged work-rule violations, but instead, were retaliatory.

Third, plaintiffs introduced testimony supporting that the investigations and potential disciplinary actions involving Cedric were more severe than required. The first investigation involved Cedric purportedly sharing answers and information with Lieutenants Miller and Whitman regarding their meeting with Deputy Warden Schooley. For that investigation, defendant

---

[14] Assistant Deputy Director Blakely denied saying this and testified that he never used the term "circling the wagons" in his life.

insisted that Cedric's charges, which included violations of asterisk rules allowing for discipline in the form of termination of employment, were warranted because sharing information and questionnaire answers was expressly forbidden. There can be little dispute of defendant's clear policy against sharing information and questionnaire answers related to ongoing investigations, but there was a significant factual dispute about defendant's responses to allegations that such sharing occurred.

As just noted, Cedric was charged with work-rule violations permitting him to be fired as discipline. Meanwhile, plaintiffs presented evidence that Kraft and Agent Avolio shared information about the investigation related to Lisa's complaints of racial harassment—indeed, Kraft admitted she asked Agent Avolio how she should answer the questions on the investigatory questionnaire, and later showed Agent Avolio her actual answers—but neither Kraft nor Agent Avolio were investigated or charged with any work-rule violations for their sharing of answers to questionnaires. Further, after Cedric made a harassment complaint, an investigator for defendant discovered that IA Investigator Cusack had provided confidential information about his investigation to Deputy Warden Schooley, yet, after this charge was investigated, IA Investigator Cusack was only cited with a single work-rule violation and disciplined with a written reprimand. Plainly, such is not comparable to Cedric's multitude of work-rule violations, a stop order, and possible termination if he had not preemptively retired. While defendant attempted to explain away the differences in punishment between these situations and Cedric's, plaintiffs presented ample evidence showing how defendant approached Cedric's investigation differently than the others, which led to the different resulting punishments. Moreover, the jury was free to disbelieve—or find immaterial—defendant's reasons for why Cedric's violation of the same rule warranted a significantly harsher punishment than the others. Consequently, a reasonable juror could infer that the extent of the discipline imposed on Cedric as a result of this first investigation was comparatively undeserved, which supports a causal connection under *West*, 469 Mich at 186-187.

The second investigation, which related to Cedric's communications with Cheeks and decision to remove CO Goodfellow's ticket from the review process, could also support an inference that Cedric's punishment was undeserved, and thus that there was a causal connection between Cedric's protected activity and the adverse action. The investigation arose out of a visit between Cheeks and Prisoner Harding-Bey, during which CO Goodfellow suspected inappropriate sexual contact, and thus wrote a misconduct ticket for Prisoner Harding-Bey and a visitor restriction for Cheeks. During a jailhouse telephone conversation later in the day, Prisoner Harding-Bey said he would speak with Inspector Douglas, Warden Chapman, and Deputy Warden Schooley about the misconduct ticket, and asked Cheeks to contact Cedric. The next morning, Cheeks contacted Cedric about the situation, but Cedric did not see the message until later, after he and multiple persons had reviewed a video of the incident and all agreed to throw out the misconduct ticket. Afterwards, Cedric contacted Cheeks and let her know. After an eventual investigation performed by IA Manager Marschke, Cedric was charged with numerous work-rule violations, including lying in an investigation, failing to review the misconduct ticket with CO Goodfellow, failing to report his contacts from Cheeks to Warden Chapman, and overfamiliarity with a prisoner's visitor. As with the first investigation, these charges included violations of asterisk rules, which meant Cedric could be terminated as discipline.

At trial, plaintiffs submitted ample evidence from which a reasonable juror could infer that all of these charges were unnecessarily trumped up as either questionable application of the rules (multiple witnesses testified that they did not believe that Cedric's conduct actually amounted to a violation of some of the rules cited by IA Manager Marschke) or not actually warranted because they were innocent errors (Cedric denied lying during the investigation, explaining that his answers to some of the questions were wrong because, by the time he was asked the questions, so much time had passed since the events at issue that he could only give his best guess). Thus, with this investigation too, a reasonable juror could conclude that the discipline imposed was seemingly undeserved, which supports an inference of a causal connection to a retaliatory motive. See *West*, 469 Mich at 187.

Based on the foregoing, Cedric's circumstances clearly track much closer to the plaintiff in *Henry*, 234 Mich App at 414, than they do the plaintiff in *West*, 469 Mich at 186-187. Consequently, on the basis of this evidence alone, the trial court properly denied defendant's motion for JNOV of Cedric's claim of retaliation.[15]

To summarize, defendant's contention that Cedric's claim of retaliation improperly relied on temporal proximity alone to prove a causal connection is inaccurate. The causal connection, instead, was established by a mountain of circumstantial evidence, in addition to the temporal proximity of the protected activity and the adverse action. *Rymal*, 262 Mich App at 303. Consequently, defendant's argument lacks merit, the claim was properly submitted to the jury, and the trial court did not err by denying JNOV. *Hecht*, 499 Mich at 604.

## IV. RACIST IMAGERY

During trial, plaintiffs used a demonstrative displaying representations of the word "mammy" for the jury. The demonstrative included several pictures, including racist caricatures, photos of "Aunt Jemima," a picture of the character "Mammy" from Gone with the Wind, and a breastfeeding slave. Defendant objected to the demonstrative before and during trial, arguing that it was irrelevant and unfairly prejudicial. The trial court overruled defendant's objections. After the jury rendered its verdict in favor of plaintiffs, defendant requested a new trial, again arguing that the racist imagery was improperly admitted because it was irrelevant and unfairly prejudicial. The trial court denied defendant's request. On appeal, defendant argues that the trial court's decisions to admit the evidence and to deny its request for a new trial were abuses of discretion. Given that the abuse-of-discretion standard is highly deferential, we disagree.[16]

---

[15] We note that there was even more evidence about the questionable nature of the investigations surrounding Cedric from which a juror could arguably infer retaliatory motive. As will be discussed later in this opinion, plaintiffs presented other-acts evidence that defendant had a historical scheme or plan of retaliation in response to complaints of harassment.

[16] We note that defendant does not single out any one image and argue that it was irrelevant or unfairly prejudicial, but argues only that the entire demonstrative was so. We therefore limit our review to the demonstrative as a whole, not whether every single image depicted in the

A. STANDARD OF REVIEW

Typically, "[t]his Court [] reviews for an abuse of discretion the trial court's decision to grant or deny motions for a new trial . . . ." *Rental Props Owners Ass'n of Kent Co v Kent Co Treasurer*, 308 Mich App 498, 531; 866 NW2d 817 (2014). Similarly, "[t]his Court reviews for an abuse of discretion a trial court's decisions regarding the admission of evidence . . . ." *Spectrum Health Hosps v Farm Bureau Mut Ins Co of Mich*, 333 Mich App 457, 477; 960 NW2d 186 (2020). "A trial court does not abuse its discretion when its decision falls within the range of principled outcomes." *Rock v Crocker*, 499 Mich 247, 260; 884 NW2d 227 (2016).

B. ANALYSIS

Generally, "[a]ll relevant evidence is admissible," and "[e]vidence which is not relevant is not admissible." MRE 402. A demonstrative exhibit, like all evidence, must be relevant to be admissible at trial. *Lopez v Gen Motors Corp*, 224 Mich App 618, 629 n 16; 569 NW2d 861 (1997). " 'Relevant evidence' means evidence having any tendency to make the existence of any fact that is of consequence to the determination of the action more probable or less probable than it would be without the evidence." MRE 401. "The relevance contemplated in MRE 401 and MRE 402 is logical relevance." *Rock*, 499 Mich at 256.

Even when evidence is relevant under MRE 401, it can be excluded under MRE 403 "if its probative value is substantially outweighed by the danger of unfair prejudice[.]" "Relevant evidence is inherently prejudicial; but it is only unfair prejudice, substantially outweighing probative value, which permits exclusion of relevant matter under" MRE 403. *People v Mills*, 450 Mich 61, 75; 537 NW2d 909 (1995), mod 450 Mich 1212 (1995) (quotation marks and citation omitted). Consequently,

> photographs that are merely calculated to arouse the sympathies or prejudices of the jury should not be admitted. However, if a photograph is otherwise admissible for a proper purpose, it is not rendered inadmissible merely because it brings vividly to the jurors the details of a gruesome or shocking accident or crime. [*People v Head*, 323 Mich App 526, 541; 917 NW2d 752 (2018) (quotation marks and citation omitted).]

Defendant contends that the images portraying the term "mammy" were irrelevant because defendant did not dispute that the term was racially offensive. Although not clearly expressed by defendant, this argument is related to the materiality of the term "mammy" in this case. As relevantly and succinctly summarized by this Court:

> Relevance divides into two components: materiality and probative value. Material evidence relates to a fact of consequence to the action. A material fact need not be

demonstrative was relevant and not unfairly prejudicial. We further note that, while the demonstrative was apparently displayed for the entirety of trial, defendant conceded at oral argument that it never objected to the length of time that it was displayed.

an element of a crime or cause of action or defense but it must, at least, be in issue in the sense that it is within the range of litigated matters in controversy. Materiality looks to the relation between the propositions that the evidence is offered to prove and the issues in the case. If the evidence is offered to help prove a proposition that is not a matter in issue, the evidence is immaterial. [*Hardrick v Auto Club Ins Ass'n*, 294 Mich App 651, 667; 819 NW2d 28 (2011) (quotation marks, citations, and alterations omitted), lv den 493 Mich 867 (2012).]

Briefly, defendant essentially argues that the "mammy" imagery was not material to the case because, by not challenging the racially offensive nature of the term, it was no longer "in issue in the sense that it [was not] within the range of litigated matters in controversy." *Id*. (quotation marks and citation omitted). The record, for many reasons, reveals otherwise.

During trial, Lisa's case focused heavily on the term "mammy." She was first called the term by Kraft while working at defendant's Lapeer office, which led her to file her formal complaint. Lisa then had a conversation with Agent Avolio about a Hispanic parolee who supposedly used the word "mammy" to describe the parolee's girlfriend, then was allegedly called the term by Agent Zarka when she transferred back to Macomb, and was exposed to the term a final time during a training on harassment conducted by Field Training Officer Rogers. Lisa claimed that all of the instances of racial harassment, but especially use of the term "mammy," had caused her to suffer significant issues related to her mental health. Dr. Walavalkar, Dr. Shiener, Dr. Rubenfaer, and Harris, who was Lisa's treating therapist, all agreed that Lisa had become psychiatrically ill as a result of the racial harassment. They believed that Lisa's depression and anxiety was chronic, would never be cured, and needed to be treated in order to stop the conditions from worsening. Lisa's request for noneconomic damages was premised on her emotional suffering caused as a result of the racial harassment, which largely revolved around the use of the term "mammy."

Defendant's contention that the racist imagery was irrelevant because they did not contest that the term "mammy" was racist—even if true—does not render the evidence irrelevant because plaintiff did not submit the demonstrative to show that the term was racist, but to show how Lisa perceived the term, which goes to the noneconomic damages suffered by Lisa as a result of repeatedly hearing and being called "mammy." As summarized above, plaintiffs introduced significant evidence about Lisa's emotional suffering after being subjected to racial harassment, which often focused on the term "mammy." Because of the psychological harm, Lisa requested a significant amount of noneconomic damages in the form of mental anguish, which she was permitted to do. "Victims of discrimination may recover for the humiliation, embarrassment, disappointment and other forms of mental anguish . . . ." *Campbell v Dep't of Human Servs*, 286 Mich App 230, 246; 780 NW2d 586 (2009) (quotation marks and citation omitted). While defendant may not have challenged the offensive nature of the term "mammy," it vigorously argued about the psychological damages Lisa suffered because of hearing and being called the term. During cross-examination of Lisa's medical providers and experts, defendant repeatedly drew attention to the fact that their opinions about Lisa's emotional suffering relied heavily on Lisa's subjective complaints of suffering. Even though the two psychiatrists, Drs. Rubenfaer and Shiener, insisted they were not merely conduits of information from Lisa, defendant sought to have the jury infer the two doctors had only diagnosed Lisa with significant mental-health issues because she exaggerated her symptoms. Plaintiffs sought to rebut this defense in at least two ways:

-33-

(1) through the testimonies of Drs. Rubenfaer and Shiener, who noted that Lisa's objective expression of the symptoms of mental illness was present during their evaluations or treatment and (2) displaying to the jury what the term "mammy" meant to Lisa through the use of the demonstrative. Through this second route, jurors were able to see the images that Lisa said were conjured in her mind upon hearing the term "mammy," allowing the jury to understand how the term affected Lisa. This method seems particularly appropriate because jurors may not understand why the word "mammy" was so offensive to Lisa and caused her so much psychological suffering. Defendant's concession that the word "mammy" is offensive did not assist jurors in understanding the effect that it had on Lisa; the demonstrative, on the other hand, assisted jurors in understanding this.

In sum, the imagery related to the term "mammy" was relevant to the issue of the extent of Lisa's noneconomic damages. Lisa's psychiatric suffering, as clearly exhibited by the record, was placed at issue by defendant's chosen strategies. Consequently, the evidence was relevant to a material fact at issue during the trial.

Defendant alternatively argues that the images, even if minimally relevant, should have been excluded under MRE 403 because the images likely inflamed the passions of the jury, which was unfairly prejudicial.

We agree with defendant that plaintiffs' demonstrative was highly offensive and risked inflaming the passion of the jury. The demonstrative shows the offensiveness of the term "mammy" using vivid imagery. But, as previously explained, "if a photograph is otherwise admissible for a proper purpose, it is not rendered inadmissible merely because it brings vividly to the jurors" imagery that is offensive. *Head*, 323 Mich App at 541. And, as also previously explained, the offensive imagery here was admissible for a proper purpose—to explain why the term "mammy" was so offensive to Lisa and caused her so much suffering. That is, the demonstrative was relevant to establishing the extent of Lisa's noneconomic damages. All relevant evidence is prejudicial to some extent, and the question is whether the danger of *unfair* prejudice *substantially outweighed* the probative value of the evidence. While this evidence risked inflaming the jurors' prejudice and, thus, there was a danger of unfair prejudice by showing it to jurors, the evidence was also probative to explain why Lisa was so affected by use of the term "mammy." The trial court concluded that the danger of unfair prejudice posed by the demonstrative was not substantially outweighed by its probative value. We believe that this decision was within the range of reasonable and principled outcomes. In other words, given that the deferential abuse-of-discretion standard, we conclude the that trial court did not abuse its discretion by allowing plaintiffs to display the demonstrative.[17]

---

[17] Defendant also argues that the trial court abused its discretion because the relevance of the demonstrative was significantly reduced by several witnesses' descriptions of what the term "mammy" meant to them. While defendant is correct that several witnesses gave descriptions of the physical appearance of the term "mammy," our Supreme Court has been clear that "[p]hotographs are not excludable simply because a witness can orally testify about the information contained in the photographs." *Mills*, 450 Mich at 76. Moreover, the demonstrative

-34-

## V. OTHER-ACTS EVIDENCE

At trial, plaintiffs sought to admit evidence about defendant's history of harshly responding to complaints and lawsuits related to harassment purportedly to show defendant's scheme, plan, or system of retaliating against individuals who complain about harassment. Defendant objected, arguing that it was improper propensity evidence being admitted in violation of MRE 404(b). The trial court disagreed and denied the motion. After the jury rendered its verdict, defendant argued, this time in more detail, that it was entitled to a new trial because the other-acts evidence was improperly admitted. The trial court again disagreed and denied defendant's motion. On appeal, defendant argues that the trial court abused its discretion by admitting this improper propensity evidence, and that it is entitled to a new trial because "[t]he jury in this case was inundated with improper propensity evidence . . . ." We disagree.

### A. PRESERVATION AND STANDARD OF REVIEW

Before trial, defendant moved to limit certain aspects of the other-acts evidence that plaintiffs sought to admit, and plaintiffs stipulated to those limitations. At that time, however, defendant did not object to the evidence as improper propensity evidence barred by MRE 404(b). After trial began but before the first other-acts witness was called to the stand, defendant objected, on the record, to the other-acts witnesses under MRE 404(b). Plaintiffs then responded on the record, and the trial court issued an oral ruling. Because of the way defendant chose to approach this issue, there is no lower court briefing, and the trial court's ruling on the issue is limited to only a couple pages of transcript, despite this being a significant and lengthy issue. Nevertheless, the issue was raised before the trial court and is therefore preserved. See *Glasker-Davis v Auvenshine*, 333 Mich App 222, 228; 964 NW2d 809 (2020).

After trial, defendant argued that it was entitled to a new trial because the other-acts evidence was improperly admitted. Therefore, this issue, too, is preserved. See *id*.

"This Court [] reviews for an abuse of discretion the trial court's decision to grant or deny motions for a new trial . . . ." *Rental Props Owners*, 308 Mich App at 531. Similarly, "[t]his Court reviews for an abuse of discretion a trial court's decisions regarding the admission of evidence . . . ." *Spectrum Health Hosps*, 333 Mich App at 477. "A trial court does not abuse its discretion when its decision falls within the range of principled outcomes." *Rock*, 499 Mich at 260. This Court reviews "de novo preliminary or underlying questions of law," and "[w]hen a trial court makes a determination that is legally incorrect, the court necessarily commits an abuse of discretion." *Spectrum Health Hosps*, 333 Mich App at 478.

---

was clearly better suited to convey the images that the term conjured up for Lisa than any testimony about the same could do. We therefore do not believe that the trial court abused its discretion by allowing plaintiffs to show the demonstrative to the jury.

B. ANALYSIS

Our Supreme Court, in *Rock*, 499 Mich at 256-258, provided a relevant and thorough explanation of the interplay of court rules when, as here, a party seeks to admit evidence of prior bad acts:

To be admissible, evidence must be relevant. MRE 402. Relevant evidence is "evidence having any tendency to make the existence of any fact that is of consequence to the determination of the action more probable or less probable than it would be without the evidence." MRE 401. The relevance contemplated in MRE 401 and MRE 402 is logical relevance. *People v VanderVliet*, 444 Mich 52, 60; 508 NW2d 114 (1993). Even if logically relevant under MRE 401 and MRE 402, evidence may still be excluded under MRE 404 because MRE 404 "is a rule of legal relevance, defined as a rule limiting the use of evidence that is logically relevant." *Id*. at 61-62. Legal relevance, as a limiting rule, concerns the purpose for which evidence is used. In particular, MRE 404(b)(1) states:

Evidence of other crimes, wrongs, or acts is not admissible to prove the character of a person in order to show action in conformity therewith. It may, however, be admissible for other purposes, such as proof of motive, opportunity, intent, preparation, scheme, plan, or system in doing an act, knowledge, identity, or absence of mistake or accident when the same is material, whether such other crimes, wrongs, or acts are contemporaneous with, or prior or subsequent to the conduct at issue in the case.

Therefore, evidence that is logically relevant under MRE 401 and MRE 402 may be excluded under MRE 404(b)(1) for lacking legal relevance if it does not have a proper purpose.

Other-acts evidence is only admissible under MRE 404(b)(1) when a party shows that it is (1) offered for a proper purpose, i.e., to prove something other than the defendant's propensity to act in a certain way, (2) logically relevant, and (3) not unfairly prejudicial under MRE 403. *People v Knox*, 469 Mich 502, 509; 674 NW2d 366 (2004). " '[I]f the proponent's only theory of relevance is that the other act shows defendant's inclination to wrongdoing in general to prove that the defendant committed the conduct in question, the evidence is not admissible.' " [*People v Jackson*, 498 Mich 246, 258; 869 NW2d 253 (2015)], quoting *VanderVliet*, 444 Mich at 63. In *People v Mardlin*, this Court further explained:

Evidence is *inadmissible* under [MRE 404(b)] *only* if it is relevant *solely* to the defendant's character or criminal propensity. Stated another way, the rule is not exclusionary, but is inclusionary, because it provides a nonexhaustive list of reasons to properly admit evidence that may nonetheless also give rise to an inference about the defendant's character. Any undue prejudice that arises because the evidence also unavoidably reflects the defendant's character is

-36-

then considered under the MRE 403 balancing test, which permits the court to exclude relevant evidence if its "probative value is substantially outweighed by the danger of unfair prejudice . . . ." MRE 403. Finally, upon request, the trial court may provide a limiting instruction to the jury under MRE 105 to specify that the jury may consider the evidence only for proper, noncharacter purposes. [*People v Mardlin*, 487 Mich 609, 615-616, 790 NW2d 607 (2010) (citations omitted).]

Accordingly, while MRE 404(b) is an inclusionary rule, it is still subject to the balancing test under MRE 403. [Footnotes omitted.]

Under the caselaw just summarized, then, the first issue to consider is whether the evidence was offered for a proper, nonpropensity purpose. *Rock*, 499 Mich at 257. "The proponent of the evidence has the burden of establishing a proper, noncharacter purpose for its admission under MRE 404(b)." *Merchand v Carpenter*, 501 Mich 1071, 1072 (2018). In the present case, plaintiffs argued that the evidence of defendant's previous instances of discrimination were admissible to prove defendant's "scheme, plan, or system in doing an act," which is specifically identified as a proper purpose in MRE 404(b)(1). It is not enough, however, to merely claim a proper purpose under MRE 404(b)(1); instead, the proponent of the evidence "must also *explain how* the evidence is relevant to that purpose without relying on a propensity inference." *People v Denson*, 500 Mich 385, 402; 902 NW2d 306 (2017).

Defendant challenges the testimony of four individuals as inadmissible other-acts evidence—the testimony of James Hedrick, Michael Hester, Teliferio Witcher, and certain statements by IA Manager Marschke. We address each in turn.

## 1. HEDRICK

Hedrick testified that defendant had a system of conducting sham investigations after a person either reports harassment or assists in the reporting the harassment. As an example, Hedrick said that his supervisor tried to frame him for misplacing a dangerous tool and stealing a camera after Hedrick reported the supervisor for racial harassment. Relevantly, Hedrick's testimony referenced questionable investigations arising out of those two accusations from Hedrick's supervisor. With respect to the missing tool, Hedrick noted that the supervisor had prepared a doctored photograph to implicate Hedrick, and it was Hedrick, not the investigator assigned to the case, who identified the doctored photograph and exonerated himself. During the second investigation with respect to the camera, Hedrick noted that the allegedly stolen camera was not listed on the supervisor's manifest, which once again led to Hedrick being cleared of charges. The implication from Hedrick's testimony was that absent his ability to contradict the allegations against him, he likely would have been disciplined for the false allegations, which could have led to termination. Hedrick insisted that these were examples of "gotcha" investigations, which had predetermined results before they even began because the motive was retaliation.

Hedrick also testified about a coworker who complained about their supervisor using the N-word, which led to the coworker being told to do work he was not medically fit to do. When the coworker refused to do the work, which the supervisor was aware would occur, the supervisor

reported the coworker. The coworker was then given a "stop order," which stopped him from coming to work and getting paid for at least part of the time. Defendant then conducted a year-long investigation into the coworker, which resulted in the coworker losing his house because of he could not pay the bills. Hedrick explained that the use of a "stop order" and an unusually lengthy investigation was a manner by which defendant could retaliate without issuing any official discipline. Hedrick also explained that defendant would stack charges by using multiple, often duplicative, work rules to make one potentially minor event—such as refusing to perform work that one is not medically fit to perform—look far worse.

As related to MRE 404(b)(1), plaintiffs asserted that Hedrick's testimony was relevant to defendant's scheme or system when it came to retaliating against individuals who participated in harassment complaints. The scheme or system, according to Hedrick, involved sham investigations potentially setup by bad evidence from supervisors, faulty investigations that ignored possibly determinative evidence, putting people on "stop order," and having overly lengthy investigation periods. Accordingly, plaintiffs adequately explained how Hedrick's testimony was related to a proper, nonpropensity purpose under MRE 404(b), i.e., it was legally relevant.

This testimony about the scheme or plan used by defendant was relevant to facts at issue in the litigation. The defense to Cedric's claim of retaliation was, primarily, that he had committed violations of work rules, was investigated for those in a normal manner, and faced warranted discipline before he decided to preemptively retire. Hedrick's evidence, however, allowed the jury to consider whether Cedric's investigations were part of defendant's scheme or system of retaliation. Notably, one of Cedric's issues— the accusations against Cedric regarding his decision to remove CO Goodfellow's ticket from the review process—arose after some questionable evidence was provided to IA from Cedric's supervisor and coworker. That investigation began only after Deputy Warden Schooley obtained a jailhouse telephone call between Prisoner Harding-Bey and Cheeks in which they said they would speak with then-Warden Chapman, Deputy Warden Schooley, and Cedric, and then-Warden Chapman forwarded information about the call to IA. Yet, when then-Warden Chapman did so, he only mentioned that Prisoner Harding-Bey and Cheeks referred to Cedric, omitting that they also referred to himself and Deputy Warden Schooley. When the case was then investigated by IA Manager Marschke, he did not seem concerned with Warden Chapman's questionable description of the jailhouse telephone call. In sum, then, Warden Chapman's provision of questionable evidence to IA correlated with Hedrick's testimony regarding his supervisor's use of questionable evidence to spur investigations into Hedrick.

The other connections between Hedrick's description of defendant's retaliatory scheme and Cedric's case are more direct. Hedrick testified that retaliatory investigations often resulted in a "stop order," which happened to Cedric. Further, Hedrick noted that retaliatory investigations were sometimes lengthy, and the claims related to Cedric purportedly colluding with Lieutenants Miller and Whitman on answers to questionnaires were investigated for about 11 months before Cedric finally had an opportunity to defend himself at a disciplinary conference. Finally, Cedric was charged with at least 10 work-rule violations at the same time, despite committing violations possibly explainable by a misunderstanding or confusion. This fit with Hedrick's explanation that retaliatory investigations stacked charges to make possibly minor occurrences seem worse.

As is apparent from the preceding discussion, Hedrick's testimony was not only legally relevant but logically relevant—the evidence provided grounds for the jury to understand the possible scheme or system that defendant had crafted to ensure that those who complained of harassment suffered retaliation.

Lastly, addressing MRE 403, evidence about defendant's alleged scheme or system of retaliating against employees who complained about harassment was highly probative. There was no direct evidence that defendant retaliated against Cedric, so circumstantial evidence that defendant had a scheme or system for retaliating against employees who complained about harassment and that defendant's treatment of Cedric largely followed that scheme or system was highly probative. See *People v Oliphant*, 399 Mich 472, 495; 250 NW2d 443 (1976). While there was a danger of unfair prejudice—the jury could infer that, because defendant had a system or scheme of retaliating against employees who complained about harassment, they retaliated against Cedric here—that danger was largely minimized by the trial court's limiting instruction under MRE 105. Jurors are presumed to follow their instructions. See *People v Graves*, 458 Mich 476, 486; 581 NW2d 229 (1998). In light of the fact that the danger of unfair prejudice was largely minimized, as well as the high probative value of the other-acts evidence, the trial court did not abuse its discretion when it found that Hedrick's testimony was not barred by MRE 403.

## 2. HESTER

Hester, who retired from defendant in 2014, testified about the same coworker as Hedrick, who had been called the N-word and complained, and was then asked to do work he was not medically fit to do, and when he refused, was reported, investigated, put on stop order, and went unpaid for a year, which led to him losing his house. Hester reiterated the retaliatory nature of the investigation into that coworker. Hester also claimed that he personally suffered retaliation because he assisted with some employees' harassment claims. According to Hester, he was accused of punching a coworker in on a time clock in retaliation for his complaints of harassment. When the investigation began, Hester encouraged the investigator to watch the video footage of the area covering the time clock. But instead of reviewing the exculpatory evidence, defendant decided to dismiss the claims against Hester. On another occasion, Hester was asked to perform the work of an electrician, which he was not qualified to do. When he complained to representatives of defendant at its headquarters in Lansing, they did not remedy the issue. Finally, Hester testified that he was placed on a "stop order" for two years while defendant investigated an accusation against Hester, the substance of which he was not informed about. Eventually, out of the blue, he was told to come back to work. He later discovered that an investigator for defendant told female prisoners that they could make money if they accused Hester of sexual assault, and the police eventually became involved, after which the prisoners recanted, the charges against Hester were dropped, and he was commanded to return to work. Hester also noted that defendant would stack charges against someone who had complained of harassment to ensure that even minor mistakes looked far worse.

As with Hedrick's testimony, plaintiffs asserted that Hester's testimony was relevant to show defendant's scheme or system for retaliating against individuals who participated in harassment complaints, which was a permissible purpose for the evidence under MRE 404(b). Plaintiffs explained that Hester's experiences with retaliatory investigations from defendant showed how the system worked. The examples provided by Hester demonstrated defendant's

attempts to ignore pertinent and potentially exculpatory evidence when conducting retaliatory investigations, as well as using overly long investigations. Further, Hester's testimony demonstrated that when someone was exonerated from a retaliatory investigation, it was not due to defendant's investigation, but because the inadequacy of the charges was discovered by someone other than defendant. Thus, plaintiffs adequately explained the legal relevance of this testimony.

The logical relevance of this testimony is obvious—Hester's testimony suggested that defendant uses inflammatory allegations, sham investigations, bad or questionable evidence, stop orders, a lengthy time period of investigation, and stacked charges to ensure someone who complains of harassment will face exorbitant discipline. Cedric faced circumstances matching closely to this described scheme or system. Accordingly, plaintiffs adequately explained how Hester's testimony was both logically and legally relevant under MRE 404(b).

Lastly, Hester's other-acts testimony was not barred by MRE 403 for the same reasons that Hedrick's was not barred by that rule. To briefly reiterate, evidence about defendant's alleged scheme or system of retaliating against employees who complained about harassment was highly probative, and the danger of unfair prejudice that this evidence posed was largely minimized by the trial court's limiting instruction under MRE 105, which jurors are presumed to follow. See *Graves*, 458 Mich at 486. Accordingly, the trial court did not abuse its discretion by ruling that the danger of unfair prejudice posed by admitting this evidence did not substantially outweigh the evidence's probative value, and thus the evidence was not barred by MRE 403.

### 3. WITCHER

Defendant next challenges the testimony of Witcher, who retired from defendant in the mid-2010s. Witcher agreed with Hedrick and Hester, generally, that once someone complained of harassment, they became a target for defendant, saying, "[O]nce you become a target with [defendant], what they tend to do is focus on you, cook up charges, single you out, treat you different, put charges on you." Witcher said that he had seen IA manipulate investigations to ensure that a desired result is reached when the investigation was retaliatory in nature. Witcher also explained that defendant would stack charges against someone who complained, turning one alleged error into many work-rule violations. Witcher added that defendant would "bootstrap" investigations, scheduling them so they all were finalized at the same time, which allowed defendant to combine disciplinary conferences to make the subject of the investigation look worse than the relatively minor issues. Lastly, Witcher testified that he was told about a recent incident of retaliation that occurred after Witcher's retirement. According to Witcher, the employee said that she had been approached by her supervisors to frame a volunteer that the supervisors wanted to remove from the position. When the employee refused and complained about the improper behavior, defendant sent IA Manager Marschke to personally investigate. He quickly found the employee's claims to lack sufficient supporting evidence to allow for charges, closed the investigation, and then opened a new one into the employee who complained. The employee was eventually charged, convicted at a conference, and her employment was terminated.

The relevance of Witcher's more general claims were logically and legally relevant to a proper purpose for the same reasons discussed for the other two witnesses—the testimony showed defendant's scheme or system for retaliating against individuals who participated in harassment

-40-

complaints, and plaintiffs adequately explained how Witcher's testimony related to that proper purpose. See MRE 404(b)(1); *Denson*, 500 Mich 385, 402. Moreover, his more specific claim had even more probative value than the more general allegations. The incident was more recent and involved an alleged retaliatory investigation by IA Manager Marschke, which Cedric alleged happened to him. Further, the investigation started out with one subject, but shifted quickly to focus on the individual that defendant sought to retaliate against, which, again, is what Cedric alleged happened to him when IA Investigator Cusack shifted the investigation of Deputy Warden Schooley to focus on Cedric as retaliation for plaintiffs' then-recently filed complaint. This additional level of specificity shined light on another facet of defendant's system, which was to send its highest-ranking investigator to perform an investigation and to use an ongoing investigation as a springboard to shift focus to the person who complained. Thus, the trial court did not abuse its discretion in determining the evidence was relevant for a proper purpose under MRE 404(b)(1). See *Rock*, 499 Mich at 257.

Lastly, for the same reasons that Hedrick's and Hester's testimony was not barred by MRE 403, Witcher's other-acts testimony was not barred by that rule.[18]

### 4. IA MANAGER MARSCHKE

The last witness challenged by defendant on appeal is IA Manager Marschke, who testified that he was only aware of a single "gotcha" investigation in his time with defendant. IA Manager Marschke insisted that he had discovered the investigation was improper, refused to participate, and reported it. This occurred under a prior administration, which then retaliated against IA Manager Marschke for a time. When the administration changed, IA Manager Marschke was appointed to manager of IA. IA Manager Marschke insisted that the new administration, with him heading IA, no longer conducted "gotcha" or retaliatory investigations.

Despite IA Manager Marschke's insistence that he was speaking about only a single investigation under a different administration, his testimony showed defendant, at least at the time, conducted sham or "gotcha" investigations to essentially frame certain employees. His testimony also established that defendant had retaliated against IA Manager Marschke when he complained about improper procedures. Thus, IA Manager Marschke's testimony was logically and legally relevant to defendant's "scheme, plan, or system in" shifting the focus of investigations, as well as using "gotcha" investigations, as means of retaliation. MRE 404(b)(1). This was probative of a material fact at issue because Cedric claimed retaliation, was investigated by IA Manager Marschke, and had an investigation into Deputy Warden Schooley shift focus to Cedric. *Rock*, 499 Mich at 257.

---

[18] In its brief on appeal, defendant briefly argues that a portion of Witcher's testimony was inadmissible hearsay. We decline to consider the merits of this argument because defendant did not list it in its statement of questions presented in its brief on appeal, and instead, only challenged Witcher's testimony on the basis of MRE 404(b). See *Seifeddine v Jaber*, 327 Mich App 514, 521; 934 NW2d 64 (2019) (explaining that a party waives an issue on appeal "by failing to include it in [its] statement of questions presented").

Lastly, for the same reasons that Hedrick's, Hester's, and Witcher's testimony was not barred by MRE 403, IA Manager Marschke's other-acts testimony was not barred by that rule.

## 5. DEFENDANT'S ARGUMENTS

Defendant first argues that the testimony of the other-acts witnesses was not legally relevant because it was not admitted for a proper purpose. For the reasons explained above, we disagree.

Defendant next argues that, even if legally relevant, the disputed testimony was not logically relevant because it "involved entirely different facilities, other supervisors, and distinct time periods." While defendant is correct about the differences with the other-acts evidence, it was clear that all of the witnesses were talking about a broad, overarching scheme within defendant as an organization. Although the investigations discussed by the other-acts witnesses did not involve the same place or all of the same people within defendant's organization as this case,[19] the testimony of those witnesses established that it was powers broadly wielded by defendant that allowed for the scheme or system of retaliation to work. In other words, the differences highlighted by defendant did not affect the logical relevance of the other-acts evidence in this case. Rather, as plaintiffs and the trial court pointed out, the differences go to the weight that the jury could choose to give the evidence. For instance, if, as defendant contended, it was a different administration that used defendant's centralized power to enable the retaliatory investigations that the other-acts witnesses testified about, and that administration had changed before the investigations in this case began, then defendant could present that information to the jury, who could then decide if a change in administration actually fixed the retaliatory system that defendant enabled.[20]

Finally, defendant argues that the evidence should have been barred by MRE 403. Defendant argues that the danger of unfair prejudice was particularly pronounced here because "there was no direct evidence that the investigations involving [Cedric] were retaliatory." Yet defendant does not cite any caselaw to support that a lack of other evidence to support a material issue increases the risk of *unfair* prejudice. It certainly makes the evidence more prejudicial, but that is because a "dearth of evidence" on a particular material issue makes evidence related to that issue "particularly important" to the case. *Oliphant*, 399 Mich at 495. That is, any probative evidence is prejudicial to some extent, *Mills*, 450 Mich at 75, and the lack of other evidence on the issue increases the probative value of the other-acts evidence, yet this by itself does not correlate to an increase in the danger of *unfair* prejudice.

---

[19] We note, however, that at least some of the people involved in this case—such as Administrator Warner—were seemingly involved in past administrations that handled the cases discussed by the other-acts witnesses.

[20] Indeed, this was one of defendant's strategies during trial. But, unfortunately for defendant, this strategy was undercut at least in part by the testimony of its own witness, Administrator Warner, who insisted that, despite the change in administration, the processes of investigations used by defendant had not changed.

Defendant also argues that the other-acts evidence was improperly admitted because it was used to "bolster [a] theory of a department-wide conspiracy to punish everyone who ever complained about anything; a conspiracy so vast and powerful that it covered myriad locations and survived a change in administrations." Even if this was the theory that plaintiffs were using the other-acts evidence to support, defendant's argument reads like a reason why a factfinder should disbelieve plaintiffs' evidence, not a reason to conclude that the evidence should have been barred by MRE 403.

Defendant lastly argues that allowing the other-acts evidence was "inequitable," and therefore it should have been barred by MRE 403, because to dispute the allegations "would have required several trials within the trial to present the facts of each and every investigation so as to explain its progression and justify its outcome." While this could be a proper basis for a court excluding evidence under MRE 403 (i.e., the trial court could exclude evidence due to "considerations of undue delay" or "confusion of the issues," see MRE 403), the trial court impliedly declined to do so in this case.[21] This was not outside the range of reasonable and principled outcomes. This was a 16-day jury trial, and it is not clear that rebutting the other-acts evidence would have added significantly to this already lengthy trial. Moreover, as previously explained, the evidence was highly probative of a material issue in this case. The fact that it would be difficult for defendant to rebut highly probative evidence on a material issue is not a particularly persuasive reason to bar the evidence under MRE 403, and, in our opinion, it is certainly not a reason to conclude that the trial court abused its discretion by refusing to do so.[22]

For these reasons, we disagree with defendant that the trial court abused its discretion when it refused to exclude plaintiffs' other-acts evidence.

VI. MISCONDUCT BY PLAINTIFFS' COUNSEL

Defendant next argues that it is entitled to a new trial because of the persistent improper comments and arguments made by plaintiffs' counsel. While we agree that plaintiffs' counsel

---

[21] As noted previously, defendant did not brief its objection to the other-acts evidence, but only made an oral motion after trial started. During that motion, defendant's counsel stated only a single time that it was "going to have to relitigate all of those issues," and then never mentioned this point again. Instead, defendant insisted that the other-acts evidence was not relevant because of the change in administration. It is unclear that defendant's single sentence was sufficient to preserve the argument for appeal, but assuming it was, the trial court did not explicitly rule on the issue.

[22] We also note that at least some of the retaliatory investigations discussed by the other-acts witnesses apparently resulted in cases that defendant either lost or settled, and plaintiffs stipulated to not present those results to the jury. It is therefore not entirely clear why defendant would want to walk through "the facts of each and every investigation so as to explain its progression and justify its outcome"—avoiding discussion about at least some of the outcomes of the investigations seemed to work to defendant's advantage.

made numerous improper comments and, at times, acted unprofessionally, we do not believe that a new trial is warranted.

## A. STANDARD OF REVIEW

"This Court [] reviews for an abuse of discretion the trial court's decision to grant or deny motions for a new trial . . . ." *Rental Props Owners*, 308 Mich App at 531. Similarly, when considering a claim of attorney misconduct, this Court "review[s] for an abuse of discretion a trial court's general conduct of a trial." *Zaremba Equip, Inc v Harco Nat'l Ins Co*, 302 Mich App 7, 21; 837 NW2d 686 (2013), lv den 495 Mich 947 (2014). "A trial court does not abuse its discretion when its decision falls within the range of principled outcomes." *Rock*, 499 Mich at 260.

## B. ANALYSIS

"A trial court may grant a new trial when the misconduct of the prevailing party materially affected the substantial rights of the nonprevailing party." *Estate of Carlsen v Southwestern Mich Emergency Servs, PC*, ___ Mich App ___, ___; ___ NW2d ___ (2021) (Docket No. 351159), slip op at 9. As explained by our Supreme Court:

> When reviewing an appeal asserting improper conduct of an attorney, the appellate court should first determine whether or not the claimed error was in fact error and, if so, whether it was harmless. If the claimed error was not harmless, the court must then ask if the error was properly preserved by objection and request for instruction or motion for mistrial. If the error is so preserved, then there is a right to appellate review; if not, the court must still make one further inquiry. It must decide whether a new trial should nevertheless be ordered because what occurred may have caused the result or played too large a part and may have denied a party a fair trial. If the court cannot say that the result was not affected, then a new trial may be granted. Tainted verdicts need not be allowed to stand simply because a lawyer or judge or both failed to protect the interests of the prejudiced party by timely action. [*Reetz v Kinsman Marine Transit Co*, 416 Mich 97, 102-103; 330 NW2d 638 (1982).]

"An attorney's comments do not normally constitute grounds for reversal unless they reflect a deliberate attempt to deprive the opposing party of a fair and impartial proceeding." *Zaremba Equip*, 302 Mich App at 21. "Reversal is required only where the prejudicial statements of an attorney reflect a studied purpose to inflame or prejudice a jury or deflect the jury's attention from the issues involved." *Hunt v Freeman*, 217 Mich App 92, 95; 550 NW2d 817 (1996). "While a lawyer is expected to advocate his client's cause vigorously, parties are entitled to a fair trial on the merits of the case, uninfluenced by appeals to passion or prejudice." *Badalamenti v William Beaumont Hosp-Troy*, 237 Mich App 278, 292; 602 NW2d 854 (1999).

Defendant first argues that plaintiffs' counsel improperly "injected racially inflammatory terms into the proceedings" by using numerous racial slurs during arguments that Lisa was never subjected to while working at defendant, including "tar baby," "coon," and the entire N-word. We agree that these words are incredibly offensive and ran the risk of inflaming the passion of the jury.

Yet Lisa's case largely rested on being subjected to a racial slur multiple times and the effect that this had on her. Counsel's use of other slurs was to analogize the offensiveness of the term "mammy" to other common racial slurs to help explain why it had the effect on Lisa that it did, not to inflame jurors' passion. That said, the use of offensive racial slurs still likely stirred emotions in the jurors, but we cannot conclude that this was per se improper in this case because racial slurs and their effects were germane to the one of the central issues. In short, in a case that revolved largely around the use of a racial slur, it is difficult to conclude that use of racial slurs during argument to show the offensive of the term at issue demonstrates an attempt to "deflect the jury's attention from the issues involved," *Hunt*, 217 Mich App at 95, and we will not do so in this case.

Defendant attempts to analogize this case to *Gilbert v DaimlerChrysler Corp*, 470 Mich 749, 772; 685 NW2d 391 (2004), where our Supreme Court held, in relevant part, that in the plaintiff's action for sexual harassment, her counsel's attempts to liken the German-owned corporate defendant to Nazis was improper. As noted by our Supreme Court, such an argument was "a naked appeal to passion and prejudice and an attempt to divert the jury from the facts and the law relevant to this case." *Id*. at 773. Here, however, using racial slurs to emphasize the offensiveness of the racial slur to which Lisa was subjected did not divert the jury from the relevant issues in the case, which involved the use of racial slur and its effect on Lisa. Moreover, plaintiffs' counsel's use of racial slurs other than the one directed at Lisa was not so pervasive that it risked diverting the jurors' attention away from the facts of the case, i.e., jurors still understood that the only slur directed at Lisa while employed with defendant was "mammy."[23]

---

[23] Defendant also argues that plaintiffs' counsel improperly referenced lynchings during closing arguments, saying (according to defendant), "Coon is a sign that they used to hang on blacks that they lynched and hung from a tree. And that's what they did to Lisa . . . ." This, however, is not reflected in the transcript. According to the transcript, plaintiff's counsel said,

> And you need to understand, and I know we've talked about this, and these are really offensive images, and these are really offensive things, but this is a reality that it's hard for us who are not African-Americans to fully understand. We understand that this stuff is offensive, but these images and the history behind this, you know, Kuhn [sic] is a sign that they used to hang on blacks that they lynched and hung from a tree. And that's offensive to me and I'm sure it's offensive to you. But to have an African-American to have these types of things said is incredibly, incredibly offensive in a way that's hard for us to fully understand. And that's what they did to Lisa, and that's what [sic] they tried to minimize these things and tried to make excuses and deflect from what happened.

In context, it is evident that plaintiffs' counsel did not insinuate that defendant "lynched" Lisa, as defendant contends. Rather, plaintiff's counsel referenced lynching to explain why the word "coon" (as explained in the fact section of this opinion, the homophone of "coons"—"Kuhns"— was said to Lisa at work) was offensive to Lisa, as an African American. Further, plaintiffs'

Defendant next argues that plaintiffs' counsel improperly characterized defendant as an unfeeling entity that needed to be held accountable for its actions. In *Reetz*, 416 Mich at 111, our Supreme Court cautioned against an attorney's attempt "to create in the minds of the jurors an image of [the defendant] as an unfeeling, powerful corporation controlled by a ruthless" leader. And in *Gilbert*, 470 Mich at 765, our Supreme Court explained that the CRA does not permit punitive damages, so it is improper for a plaintiff to argue that a defendant should be punished with an excessive verdict.

Here, defendant takes issue with statements made by plaintiffs' counsel during closing that defendant did not care about plaintiffs and that the only thing that will make them care is a verdict. We are not convinced that the arguments pointed to by defendant were so pervasive or improper as to require reversal. At least some of plaintiffs' counsel's arguments about defendant being uncaring were counsel highlighting evidence to that effect—like plaintiffs' counsel's argument that defendant was uncaring when it did little to ensure Lisa's safety while she was struggling with threats from a probationer. In other instances, however, such as when plaintiffs' counsel urged the jury to provide a significant verdict to hold defendant accountable and make them care, the conduct of plaintiffs' counsel was clearly improper.[24] But, in that instance, upon objection by defendant's counsel, the trial court provided a curative instruction, and plaintiffs' counsel clarified that he was only requesting a verdict requiring defendant to pay "for the harm that was done." Thus, the improper statement was quickly and specifically remedied. After a review of the entire record, it is clear that plaintiffs' counsel's reference to defendant as an uncaring entity who should be held accountable with a verdict were scarce and, though improper, were minimally prejudicial. As our Supreme Court in *Reetz*, 416 Mich at 111, explained, minor instances of misconduct do not usually amount to error requiring reversal. Accordingly, while plaintiffs' counsel made some improper arguments about defendant being an uncaring entity that should be held accountable, the misconduct was not enough to warrant a new trial.[25]

---

counsel's statement, "And that's what they did to Lisa" is, in context, clearly not a reference to lynching, but to the fact that Lisa was subjected to offensive words while working for defendant.

[24] Defendant points to other instances where plaintiffs' counsel mentions accountability, but the other statements cited by defendant were not improper. When the arguments are read in context, it is clear that plaintiffs' counsel was not urging jurors to hold defendant accountable, but rather was saying that defendant had not held its offending workers accountable. These various arguments, in context, related to whether defendant's response to Lisa's complaints of harassment were adequate and whether defendant had a retaliatory motive when pursuing investigations into Cedric. Such arguments were not improper.

[25] In contrast, our Supreme Court in *Reetz*, 416 Mich at 111, held that a new trial was warranted because the plaintiff's counsel argued that the defendant "cared nothing about [the plaintiff]'s welfare, that [the defendant] can afford the best of everything, and repeated references to George Steinbrenner III, owner of the New York Yankees and chairman of the board of [the defendant's] parent corporation, although he was not personally a party in the case." The improper arguments in this case fall well short of the egregiously improper arguments made in *Reetz*.

Defendant next takes issue with plaintiffs' counsel's arguments that defendant refused to take responsibility for its actions. It is difficult, however, to understand what defendant believes was improper about this argument. For a month of trial, defendant argued that it was not responsible for any damages suffered by plaintiffs. The argument by plaintiffs' counsel that defendant did not take responsibility for its actions was, thus, clearly based on the facts of the case, not an inappropriate argument for punitive damages or an argument intended to arouse the passion of the jurors.

Finally, defendant argues that plaintiffs' counsel improperly denigrated defendant's attorney, the Attorney General (AG). Defendant identifies the subsequent passages as evidence of plaintiffs' counsel's misconduct related to accusing defendant's counsel of lying and working with witnesses to accomplish the same:

> And let's just start with [IA Manager] Marschke because we all remember the day that he testified. It was a long day. He was here all day, and he told us how the department has a history and a culture of retaliation and attacking people.
>
> But let's look at what he said before because guys remember, I had previous testimony from [IA Manager] Marschke. So remember, when [IA Manager] Marschke got on the stand, let's look at what he first says. And this is a theme throughout this case too. A theme of lies by the [AG] and by the [defendant]. So, and I love my Elmo, and if it has been annoying, I apologize, but it's an easy way to get evidence across. I said, sir, would you admit under oath that [defendant] has a history of manipulating investigations in order to get the results he wants? This is right out of the gate, and [IA Manager] Marschke denied it.
>
> Well, thank God I had previous testimony from [IA Manager] Marschke that we were able to go through because we all know what he said and he said it wasn't just once. He said it wasn't just an isolated incident. [IA Manager] Marschke testified that it happened many, many times, because then we heard the [AG], which was another theme that we all know. Suddenly, people go to lunch and their testimony changes. What's going on? And before he has to go to lunch with the [AG] or talk to the [AG] over break, this is what he said. He said it happened numerous times. I've been there a long time, 14 years.
>
> * * *
>
> Remember [Supervisor] Slater, the supervisor of Lisa? We had him on the stand and I asked him, sir, did you say on the first day when you introduced Lisa and another white person, I didn't know what I was getting with her? Remember, he walked around and said I didn't know what I was getting with her. And then we broke for the weekend, he talked to the [AG], and we come back on Tuesday and his testimony changed.
>
> And I was so upset about this, I ordered the transcript of [Supervisor] Slater too because when I asked him about it on the stand, he said oh, I never said that. My testimony never changed. And I had written it down. So I ordered [Supervisor]

Slater's testimony. And let me show you what [Supervisor] Slater said before he talked to the [AG] over the weekend.

I said [Supervisor] Slater, and when you introduced Lisa, you told everybody that you didn't know what you're getting with her, isn't that correct? Correct. That was [Supervisor] Slater's testimony before we broke for the weekend. And then the weekend came, he talked to the [AG] and suddenly everything changed. Just like so many other witnesses in this case.

* * *

[Defendant is] represented by a law enforcement agency, the [AG]. Who is supposed to by the way investigate under certain circumstances perjury. You have two of the state's highest law enforcement agencies coming in here and lying, and changing their testimony, and leaving out facts, and changing investigations, and basically doing whatever they want.

* * *

And then you hear the AG suggest yesterday, I don't know if you remember this, suggest on direct examination that [IA Investigator] Cusack, he is such a good investigator that he self-reported himself. Remember, they said that with [Discipline Coordinator] Nanasy, who came on right after [Administrator] Warner. That he, himself, reported himself. No, he didn't. No, he did not. That is a lie. That is a lie, and the fact that they would ask that question when they know it's not true shows what they will do in this case. And when I sit down and they get up, I want you to keep that in mind. It shows the lengths that they are willing to go to.

And I don't even understand why they would do that. I have read all of the materials in this case, they know that I know. They know that I know, and they know that I could get up and cross-examine the person. They just don't care. They don't care. [IA Investigator] Cusack is a liar. And I will say that, he is a liar and he lied. And [Discipline Coordinator] Nanasy was a liar and she was not honest with you. The only reason that [IA Investigator] Cusack got caught is because after this went down and we had information that [IA Investigator] Cusack had met with [Deputy Warden] Schooley in a parking lot, we asked and demanded that an investigation go forward and they had to do it. They had to do it, and then when there is a video, they can't lie about it. How are they going to lie their way out of the video?

In support of its argument that these statements by plaintiffs' counsel amount to misconduct, defendant relies solely on our Supreme Court's opinion in *Kern v St Luke's Hosp Ass'n of Saginaw*, 404 Mich 339; 273 NW2d 75 (1978). In that case, the Court held that a new trial was warranted based on the defendant's counsel attempt to prove a conspiracy between the "plaintiffs' attorney, medical advisor, and expert witnesses to render collusive and untrue testimony . . . ." *Id*. at 350. The Court explained that such an argument was improper because, despite attempting to do so, defendant's counsel had failed to elicit any testimony supporting such

a theory.  *Id*.  In other words, the Court in *Kern* held that a new trial was required because the defendant's counsel was making allegations about witnesses and opposing counsel—that they were lying and colluding—without any factual basis to support such a claim.  *Id*. at 353-354.  And because the arguments were on the basis of accusations not supported by a reasonable view of the record, the Court "perceive[d] a studied purpose to prejudice the jury and divert the jurors' attention from the merits of the case."  *Id*. at 354.

Unlike in *Kern*, the arguments made by plaintiffs' counsel here had some support in the record.  First, the record supports that Supervisor Slater changed his testimony between days of trial—he initially stated that he told people at the Lapeer office that he did not know what he was getting with Lisa, but after breaking for the weekend, Supervisor Slater claimed he never gave such testimony.  Then, when prompted by plaintiffs' counsel, Supervisor Slater agreed that he had spoken with the AG over the weekend.

Second, as to IA Manager Marschke, there can be little dispute that he was confronted by plaintiffs' counsel during his testimony about a prior inconsistent statement.  Relevantly, he testified at trial about the limited nature of "gotcha" investigations in defendant's past, but was shown his deposition testimony, which was different.  Considering the length of time between the two occasions, it was implied that he had met with the AG between then.

Third, turning to Discipline Coordinator Nanasy and IA Investigator Cusack, plaintiffs' counsel's argument related to a claim that IA Investigator Cusack faced lesser discipline than Cedric because he had self-reported.  IA Investigator Cusack's testimony, however, was that he only admitted to having improper contacts with Deputy Warden Schooley after Cedric initiated an investigation by complaining of discriminatory harassment.  In the process, a video of Deputy Warden Schooley and IA Investigator Cusack meeting each other outside of TCF when IA Investigator Cusack was arriving to conduct the investigation was discovered.  Discipline Coordinator Nanasy's claim of IA Investigator Cusack self-reporting, then, obviously was at least partially false.  While he may have admitted to his wrongdoing after the investigation began, there was no indication on the record that he would have done so if there never was an investigation.  Considering these questionable circumstances, it was not improper for plaintiffs' counsel to question why the AG would elicit testimony from Discipline Coordinator Nanasy about IA Investigator Cusack self-reporting.

Finally, though it is a close call, considering these various instances of potential collusion between witnesses for the defense and the AG, plaintiffs' counsel's decision to accuse the AG of such was not entirely improper.  While perhaps unprofessional and certainly a "breach[] of good manners," there was a "reasonable basis for" the characterization.  *Kern*, 404 Mich at 353-354.  In sum, then, after a review of the entire record, this accusation by plaintiffs' counsel could be appropriately characterized as "zealous advocacy for [his] clients . . . within the bounds of good lawyering within the context of [this] trial."  *Estate of Carlsen*, ___ Mich App at ___; slip op at 10.

Defendant lastly argues that even if this Court concludes that one of the alleged errors standing alone did not create sufficient prejudice to require reversal, the cumulative effect of all of the errors did.  For cumulative error to require reversal, "consequential errors must result in substantial prejudice that denies the aggrieved party a fair trial."  *Lewis v LeGrow*, 258  Mich App

-49-

175, 200; 670 NW2d 675 (2003). Stated differently, "actual errors must combine to cause substantial prejudice to the aggrieved party so that failing to reverse would deny the party substantial justice." *Id*. at 201. As discussed above, we agree with defendant that plaintiffs' counsel acted unprofessionally at times and some of his arguments amounted to attorney misconduct. The misconduct, however, was neither severe enough nor pervasive enough to warrant a new trial, and we are satisfied that any minimal prejudice flowing from the misconduct was cured by the trial court's instructions, which jurors are presumed to follow.

## VII. EXCESSIVE DAMAGES OR REMITTITUR

For its final argument, defendant contends that the trial court erred by denying defendant's motion for a new trial due to excessive damages or, in the alternative, motion for remittitur, because, according to defendant, the damages awarded were grossly excessive and not supported by the evidence. We disagree.

### A. STANDARD OF REVIEW

"We review for an abuse of discretion a trial court's decision whether to grant a motion for remittitur." *Local Emergency Fin Assistance Loan Bd v Blackwell*, 299 Mich App 727, 740; 832 NW2d 401 (2013). "A trial court does not abuse its discretion when its decision falls within the range of principled outcomes." *Rock*, 499 Mich at 260.

### B. ANALYSIS

Defendant argues the trial court should have granted remittitur related to the jury's award of both economic and noneconomic damages. "Broadly defined, remittitur is the procedural process by which a verdict of the jury is diminished by subtraction." *Andreson v Progressive Marathon Ins Co*, 322 Mich App 76, 84; 910 NW2d 691 (2017) (quotation marks and citation omitted). The Michigan Supreme Court provided the following relevant discussion of remittitur:

> In our view, the question of the excessiveness of a jury verdict is generally one for the trial court in the first instance. The trial court, having witnessed all the testimony and evidence as well as having had the unique opportunity to evaluate the jury's reaction to the proofs and to the individual witnesses, is in the best position to make an informed decision regarding the excessiveness of the verdict. Accordingly, an appellate court must accord due deference to the trial court's decision and may only disturb a grant or denial of remittitur if an abuse of discretion is shown. [*Palenkas v Beaumont Hosp*, 432 Mich 527, 531; 443 NW2d 354 (1989).]

As with motions for JNOV, "[w]hen reviewing a trial[] court's decision regarding remittitur, this Court must view the evidence in the light most favorable to the nonmoving party." *Diamond v Witherspoon*, 265 Mich App 673, 693; 696 NW2d 770 (2005), app dis 716 NW2d 551 (2006). "As long as the amount awarded is within the range of the evidence, and within the limits of what reasonable minds might deem just compensation for such imponderable items as personal

injuries sustained and pain and suffering, the verdict rendered should not be set aside." *Andreson*, 322 Mich App at 84 (quotation marks and citation omitted). The trial court

> may consider whether the verdict was the result of improper methods, prejudice, passion, partiality, sympathy, corruption, or mistake of law or fact, whether it was within the limits of what reasonable minds would deem to be just compensation for the injury inflicted, and whether the amount actually awarded is comparable to other awards in similar cases. [*Diamond*, 265 Mich App at 694.]

"[A]wards for personal injury should rest within the sound judgment of the trier of fact, particularly awards for pain and suffering . . . ." *Precopio v City of Detroit, Dep't of Transp*, 415 Mich 457, 464; 330 NW2d 802 (1982). The Michigan Supreme Court has "recognize[d] that there is no absolute standard by which to measure such awards." *Id*. at 464-465. "In a case tried to a jury, such deference may further reflect a reliance on the communal judgment of the members of the jury in awarding monetary compensation for such imponderables as pain and suffering." *Id*. at 465.

Defendant first contends that the jury's award of future economic damages was excessive because plaintiffs were making about the same amount of money at the time of trial. Defendant correctly points out that Lisa still worked in the Macomb parole and probation office and made the same amount of money, but ignores that Lisa's medical providers testified that she was completely and permanently disabled as a result of the harassment she faced in this case. Dr. Shiener was clear that, for the sake of Lisa's mental health, she should no longer be working for defendant. Similarly, defendant is correct that Cedric was also making about the same amount of money even after his constructive discharge—which required Cedric to work several jobs while collecting his pension—but Cedric's doctors stated that his mental-health situation was fraught, that he needed medication and therapy to avoid becoming significantly worse, and that having to work several jobs to maintain his level of income was a bar to such treatment.

Accordingly, the evidence supported the jury's determination that, for the sake of their mental health, plaintiffs should not still be working. Importantly, the problems with their mental health were caused by defendant. Thus, to the extent that the jury's calculation of damages was reliant upon an understanding that plaintiffs should not be working the jobs they currently worked, "the amount awarded [was] within the range of the evidence," and remittitur on that ground was not required. *Andreson*, 322 Mich App at 84 (quotation marks and citation omitted).

Next, defendant contends that the trial court should have granted remittitur because the jury could not possibly have believed the testimony of plaintiffs' damages expert, Barry Grant, about future economic damages.

For Lisa, Grant testified that he calculated lost future economic damages in two different ways. The first assumed that she would retire from defendant at the end of trial, and the second was assuming she retired at 62. Defendant insists that there could be no legal support for the conclusion Lisa would have retired any earlier than age 67, because she said so once in the past. Defendant, again, ignores the specific testimony of Lisa's treating and evaluating psychiatrists that she was entirely and permanently disabled at the time of trial. Thus, there was significant testimony establishing why Lisa would retire at the end of trial or only work for several more

years. Consequently, this argument by defendant is unconvincing, and the jury's decision to rely on Grant's testimony about Lisa's date of retirement was within the bounds of the evidence and did not require remittitur.

As for Grant's testimony about Cedric's future economic damages, defendant argues that the jury could not have believed Grant because of certain factual questions. Relevantly, Grant testified that his calculations assumed Cedric would get a 10% bonus each year of his remaining employment if he had not been forced out. Defendant claims this was unsupported by the evidence because the evidence established that 10% bonuses were rare. This argument is simply not a reason to conclude that the trial court abused its discretion by refusing to grant defendant's motion for a remittitur. None of the evidence that defendant discusses establishes that the jury could not have accepted Grant's calculation based on Cedric's 10% bonus—that a 10% bonus is rare does not mean that Cedric could not have received a 10% bonus each year. Moreover, the evidence that defendant relies on to establish that 10% bonuses were rare was presented to the jury, and it nevertheless accepted Grant's calculation using the 10% bonus, rejecting the very argument that defendant reiterates on appeal. Because 10% bonuses were possible, even though rare, Grant's calculation was not unsupported by the evidence, and the jury's calculation of damages was within the bounds of the evidence and did not require remittitur.

Grant also testified that his calculations assumed Cedric would get normal raises, similar to those provided to union employees. Grant acknowledged that he was aware Cedric was not in a union, but noted that he had been informed that nonunion employees were typically provided similar raises. Defendant insists that this requires remittitur because its HR director testified that raises for nonunion employees relied upon the budget, and thus, were sometimes not provided. Yet again, defendant's argument is unpersuasive because the evidence that defendant points to does not establish that Grant's calculation was impossible. Grant and defendant's HR director both testified that sometimes nonunion employees get raises, sometimes they do not. The jury got to decide whether they believed, in the future, Cedric would get the raises that Grant's calculation assumed, and they apparently did so. This decision by the jury was within the bounds of the evidence, even if defendant hoped the jury would believe otherwise. The trial court did not abuse its discretion by denying defendant's request for a remittitur on this ground.

Lastly, Grant provided two different calculations for Cedric: one assuming he would work for a few more years and retire as a deputy warden, the other assuming that he would work for the same amount of time but would be promoted to a warden. On this point, defendant first argues that this Court must order a remittitur because the calculation is based on a time period that the evidence does not support. In support of this argument, defendant points to a single e-mail in which Cedric said that he would probably retire in 2018, so Grant's estimation that Cedric would work longer was speculative. Defendant, however, ignores Cedric's trial testimony that he vacillated on his retirement date, and often imagined he would work longer. Cedric working longer, then, was within the bounds of the evidence and not grounds for remittitur. Defendant also contests Grant's assumption for his second calculation that Cedric would be promoted to warden, contending that remittitur is required because Cedric had never applied to be a warden in the past and becoming a warden was difficult. Yet again, such an argument does not mean that it was impossible for Cedric to become a warden. Evidence, including Cedric's testimony that he believed he would be a warden at the time of trial if he had not been constructively discharged, support that Cedric could have been promoted to warden. There was thus sufficient evidence for

the jury to believe Grant's warden-track calculation, which the jurors apparently did. The trial court did not abuse its discretion by denying defendant's request for a remittitur on this ground.

Next, defendant contends that the trial court should have granted remittitur of the noneconomic damages awarded to plaintiffs for three reasons. First, defendant claims that the verdict was not supported because evidence showed that plaintiffs were not taking their mental-health issues seriously. Defendant is correct that there was evidence that plaintiffs were not entirely compliant with their mental-health treatment plans, but, once again, defendant ignores other evidence suggesting that plaintiffs suffered from significant and permanent psychiatric illnesses. Moreover, the evidence showed that Cedric had to work several jobs at once to support his family after being constructively discharged by defendant, and Cedric's treating and evaluating medical team testified that working several jobs could be a barrier to treatment. Thus, the jury was well-founded in believing that Cedric was being undertreated because he had to work too much. The trial court did not abuse its discretion by denying defendant's request for a remittitur on this ground.

As for Lisa, evidence at trial showed that defendant interfered when Lisa attempted to take time off to care for her mental health. On one occasion, her medical and prescriptions benefits were terminated for a brief period. During her second leave, defendant forced it to end early by requiring Lisa to speak with a psychiatrist who determined Lisa was fit to work, despite contrary decisions by her own doctors. The jury could infer from this evidence that Lisa's failure to be entirely compliant with mental-health treatment was not because she was not suffering, but because there were barriers to her treatment caused by defendant. Consequently, the jury had satisfactory record support to believe that Lisa was suffering emotionally even though she might not have been compliant with her treatment plan. The trial court did not abuse its discretion by denying defendant's request for a remittitur on this ground.

Defendant also argues this Court should reverse the trial court's decision to deny remittitur because, in cases of comparable harassment, the award for noneconomic damages were far less. This argument is based on our Supreme Court's decision in *Gilbert*, 470 Mich at 767, in which the Court explained that "comparison with damage awards in comparable cases in this jurisdiction and beyond" is a relevant factor in deciding whether to grant remittitur. The Court noted that "[w]hile the resultant analysis is certainly imperfect, other damage awards may provide a range of what constitutes reasonable compensation for the type of injury suffered by a plaintiff." *Id*. Thus, "[w]ith this range in mind, the reviewing court may determine whether the verdict appears to be within the limits of what reasonable minds would deem just compensation for the injury sustained." *Id*. (quotation marks and citation omitted). Importantly, though, our Supreme Court has also cautioned courts from revisiting a jury's calculation of "for such imponderables as pain and suffering." *Precopio*, 416 Mich at 465.

Before considering the purportedly comparable cases cited by defendant, it is important to note Lisa was awarded $4.25 million in noneconomic damages and Cedric was awarded $4.35 million in noneconomic damages. Dr. Rubenfaer testified that both plaintiffs had chronic mental conditions from which they were unlikely to ever recover. Indeed, Dr. Rubenfaer testified that, absent medication and therapy, plaintiffs could become much worse. He even noted that he feared potential suicide if plaintiffs did not seek and participate in treatment. Lisa was diagnosed with major depression with features of PTSD. Cedric was diagnosed with PTSD, which required him

to be medicated for anxiety. Plaintiffs both testified that their lives and marriages had been ruined by defendant's actions in this case—they did not sleep, they lost their sex drives, they only talked about the issues at work, they stopped seeing their friends, and Lisa never left the house except for work and church. Lisa testified that she was referred to as a liar by people who used to be her friends. Cedric testified that he had pride in his position as a deputy warden, and felt terrible losing it. Cedric also felt helpless being unable to help Lisa when she was facing harassment at work, and Lisa became convinced that she could do nothing to make herself feel happy again after her complaints led to no results. Dr. Shiener, Dr. Rubenfaer, and Harris were insistent that plaintiffs were unlikely to ever get better and needed treatment to avoid getting worse.

With this in mind, defendant directs this Court to a number of verdicts in discrimination cases. We question whether any of the cases that defendant directs our attention to are comparable to this one because the information provided by defendant does not reflect that the plaintiffs in those cases were suffering permanent and debilitating psychiatric illnesses like plaintiffs here. But even if the cases were comparable, we do not believe that this would be a basis to grant remittitur in this case. In *Gilbert*, 470 Mich at 753, the case upon which defendant relies, the plaintiff was awarded "the largest recorded compensatory award for a single-plaintiff sexual harassment suit in the history of the United States." As part of its reasoning for why such an excessive verdict should be subject to remittitur, the Court refused to accept plaintiff's contention that her case "was the *worst* case of sexual harassment in the history of the country," and pointed to cases in which plaintiffs "who endure[d] sexual harassment in its most aggressive form" had received "far less in compensatory damages than the amount awarded to plaintiff." *Id*. at 769. Here, we are not dealing with the largest compensatory award for an employment-discrimination and retaliation suit in the history of the United States. More importantly, the awards in the cases cited to by defendant are not so much less than plaintiffs' awards as to convince us that remittitur is appropriate.

Further, even accepting that plaintiffs' award sufficiently exceeded other comparable awards, this was but one factor that the *Gilbert* Court identified for when courts should consider an award of damages as excessive. Another factor that a defendant must satisfy is "whether the verdict was within the limits of what reasonable minds would deem just compensation for the injury sustained." *Gilbert*, 470 Mich at 764 (quotation marks and citation omitted). The jury in this case sat through an incredibly long trial, during which they got to hear testimony from Cedric and Lisa about how their lives had changed as a result of defendant's harassment and retaliation. The jury had also heard from Dr. Shiener, Dr. Rubenfaer, Dr. Walavalkar, and Harris about just how bad plaintiffs' mental suffering was. The jury considered all of that evidence, accounting for the lifelong nature of the suffering, and came up with a calculation of noneconomic damages. Defendant has not provided any grounds in this appeal that could allow this Court to conclude that the verdict was not supported by the evidence. See *Precopio*, 416 Mich at 465 ("In a case tried to a jury, such deference may further reflect a reliance on the communal judgment of the members of the jury in awarding monetary compensation for such imponderables as pain and suffering.").

Defendant's final argument for remittitur reiterates its earlier argument that plaintiffs' counsel improperly inflamed the jurors' passion by using racial slurs and racist imagery. Defendant contends that the jury's awards could only have been so high because of prejudice or bias encouraged by plaintiffs' counsel's inflammatory behavior. For the reasons previously discussed, however, there was a reasonable basis in the evidence for the jury's awards, and the

award is not so excessive that it could only have been the result of passion and prejudice.  Thus, the trial court did not abuse its discretion by denying defendant's request for remittitur.

## VIII.  CONCLUSION

Affirmed.

/s/ Thomas C. Cameron
/s/ Colleen A. O'Brien
/s/ Brock A. Swartzle